# BENNETT, SECRETARY OF EDUCATION *v.* NEW JERSEY

No. 83–2064.  Argued January 8, 1985—Decided March 19, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 646.   POWELL, J., took no part in the consideration or decision of the case.

*Michael W. McConnell* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee* and *Deputy Solicitor General Geller.*

*Mary Ann Burgess*, Assistant Attorney General of New Jersey, argued the cause for respondent.   With her on the brief were *Irwin I. Kimmelman*, Attorney General, *Michael R. Cole*, First Assistant Attorney General, and *Regina A. Murray* and *Michael J. Haas*, Deputy Attorneys General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The issue presented is whether substantive provisions of the 1978 Amendments to Title I of the Elementary and Sec-

---

*\*Fred N. Fishman*, *Robert H. Kapp*, *Norman Redlich*, *William L. Robinson*, and *Norman J. Chachkin* filed a brief for the Lawyers' Committee for Civil Rights Under Law as *amicus curiae* urging reversal.

ondary Education Act apply retroactively for determining if Title I funds were misused during the years 1970–1972. This case was previously before the Court, and we then held that the Federal Government may recover misused funds from States that provided assurances that federal grants would be spent only on eligible programs. *Bell* v. *New Jersey*, 461 U. S. 773 (1983). We expressly declined, however, to address the retroactive effect of substantive provisions of the 1978 Amendments. *Id.*, at 781, n. 6, 782, and n. 7. On remand from our decision, the Court of Appeals for the Third Circuit held that the standards of the 1978 Amendments should apply to determine if funds were improperly expended in previous years. *State of New Jersey, Dept. of Ed.* v. *Hufstedler*, 724 F. 2d 34 (1983). We granted certiorari, 469 U. S. 815 (1984), and we now reverse.

## I

Title I of the Elementary and Secondary Education Act of 1965, Pub. L. 89–10, 79 Stat. 27, as amended, 20 U. S. C. § 241a *et seq.* (1976 ed.), provided federal grants-in-aid to support compensatory education for disadvantaged children in low-income areas.[1] Based on the theory that poverty and low scholastic achievement are closely related, Title I allocated funds to local school districts based on their numbers of impoverished children and the State's average per-pupil expenditures. H. R. Rep. No. 95–1137, pp. 4, 8 (1978); S. Rep. No. 95–856, p. 5 (1978); see 20 U. S. C. §§ 241a, 241c(a)(2) (1976 ed.); S. Rep. No. 146, 89th Cong., 1st Sess., 5–6 (1965). Within particular school districts, Title I funds were in turn directed to schools that had high concentrations

---

[1] The Education Amendments of 1978, Pub. L. 95–561, 92 Stat. 2143, 20 U. S. C. § 2701 *et seq.*, reauthorized the Title I program and generally amended the Elementary and Secondary Education Act. The Title I program was subsequently succeeded by Chapter 1 of the Education Consolidation and Improvement Act of 1981, Pub. L. 97–35, 95 Stat. 464, 20 U. S. C. § 3801 *et seq.* Chapter 1 retains Title I's focus upon assisting educationally deprived children who live in low-income areas.

of children from low-income families. § 241e(a)(1)(A). Once Title I funds reached the level of targeted schools, however, all children in those schools who needed compensatory education services were eligible for the program regardless of family income. H. R. Rep. No. 95–1137, at 4; 45 CFR § 116a.21(e) (1977); 45 CFR § 116.17(f) (1972). Respecting the deeply rooted tradition of state and local control over education, Congress left to local officials the development of particular programs to meet the needs of educationally disadvantaged children. Federal restrictions on the use of funds at the local level sought only to assure that Title I moneys were properly used "to provide specific types of children in specific areas with special services above and beyond those normally provided as part of the district's regular educational program." H. R. Rep. No. 95–1137, at 4.

The goal of providing assistance for compensatory programs for certain disadvantaged children while respecting the tradition of state and local control over education was implemented by statutory provisions that governed the distribution of Title I funds. Local school districts determined the content of particular programs, and the appropriate state education agency approved the applications for Title I assistance submitted by local education agencies. 20 U. S. C. § 241e(a) (1976 ed.). After determining that the applications complied with the requirements of federal law, the state education agencies distributed Title I funds to the school districts. §§ 241e(a), 241g. The state education agencies in turn received grants from the Department of Education upon providing assurances to the Secretary that the local educational agencies would spend the funds only on programs which satisfied the requirements of Title I.[2] *Bell* v. *New*

_____

[2] In 1980, the Department of Education replaced the former Office of Education as the federal agency responsible for administering Title I. See *Bell* v. *New Jersey*, 461 U. S. 773, 776, n. 1 (1983). For simplicity, unless the distinction is significant, we will refer to both the Office of Education and the Department of Education as the Department and to both the

*Jersey, supra,* at 776; 20 U. S. C. § 241f(a)(1) (1976 ed.). As noted *supra,* we previously held that if Title I funds were expended in violation of the provided assurances, the Federal Government may recover the misused funds from the States.

This case arises from a determination by the Department of Education that respondent New Jersey must repay $1,031,304 in Title I funds that were improperly spent during the years 1970–1972 in Newark, N. J. 461 U. S., at 777. There is no contention that the Newark School District received an incorrect allocation of Title I funds or that funds were not used for compensatory education programs. Instead, the Secretary's demand for repayment rests on the finding that Title I funds were not directed to the proper schools within the Newark School District. Regulations in effect when the moneys were expended provided that school attendance areas within a school district could receive Title I funds if either the percentage or number of children from low-income families residing in the area was at least as high as the districtwide average. 45 CFR § 116.17(d) (1972). Alternatively, the entire school district could be designated as eligible for Title I services, but only if there were no wide variances in the concentrations of children from low-income families among school attendance areas in the district. *Ibid.* A federal audit completed in 1975 determined that the New Jersey Department of Education had incorrectly approved grant applications allowing 13 Newark schools to receive Title I funds in violation of these requirements. App. 9–51.

The auditors found that during the 1971–1972 school year, the percentage of children from low-income families for the 13 schools ranged from 13% to 33.5%, while the districtwide average for Newark was 33.9%. *Id.,* at 23–24. Consequently, for that school year the auditors disallowed Title I expenditures totaling $1,029,630. The auditors also found that funds were misused during the 1970–1971 school year,

former Commissioner of Education and the Secretary of Education as the Secretary. See *ibid.*

but because of the statute of limitations, only $1,674 remains at issue for that year. App. to Pet. for Cert. 36a–37a. In June 1976, the Department issued a final determination letter to New Jersey demanding repayment of the misused funds. App. 52–58. New Jersey sought further administrative review, and hearings were held before the Education Appeal Board (Board). In those proceedings, New Jersey argued that the Department was not authorized to compel repayment, that the auditors had miscalculated the percentages of children from low-income families, and that the entire Newark School District qualified as a Title I project area under the regulations. App. to Pet. for Cert. 35a–58a. The Board rejected each of these arguments, *id.*, at 37a–58a, and ordered repayment. The Secretary declined to review the Board's order, which thereby became final. *Id.*, at 59a.

New Jersey then sought judicial review, and the Court of Appeals for the Third Circuit held that the Department did not have authority to issue the order demanding repayment. *State of New Jersey, Dept. of Ed.* v. *Hufstedler*, 662 F. 2d 208 (1981). Accordingly, the Court of Appeals did not address arguments made by New Jersey challenging the Department's determination that funds were misused. *Id.*, at 209. After remand from our decision in *Bell* v. *New Jersey*, the State argued for the first time that the 1978 Amendments to Title I, Pub. L. 95–561, 92 Stat. 2143, 20 U. S. C. § 2701 *et seq.*, should determine whether the funds were misused during the years 1970–1972. 724 F. 2d, at 36, n. 1. The Court of Appeals agreed and remanded the case to the Secretary to determine whether the disputed expenditures conformed to the 1978 standards. *Id.*, at 37. We hold that the substantive standards of the 1978 Amendments do not affect obligations under previously made grants, and we reverse. Our holding does not address whether the Secretary correctly determined that Title I funds were misused under the law in effect during the years 1970–1972, and New Jersey may renew its contentions in this regard on remand.

## II

The Court of Appeals based its holding on a presumption that statutory amendments apply retroactively to pending cases. Relying on language from *Bradley* v. *Richmond School Board,* 416 U. S. 696 (1974), the Court of Appeals observed that "[a] federal court or administrative agency must 'apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.'" 724 F. 2d, at 36, quoting 416 U. S., at 711. We conclude, however, that reliance on such a presumption in this context is inappropriate. Both the nature of the obligations that arose under the Title I program and *Bradley* itself suggest that changes in substantive requirements for federal grants should not be presumed to operate retroactively. Moreover, practical considerations related to the administration of federal grant programs imply that obligations generally should be determined by reference to the law in effect when the grants were made.[3]

As we explained in our first decision in this case, "the pre-1978 version [of Title I] contemplated that States misusing federal funds would incur a debt to the Federal Government for the amount misused." 461 U. S., at 782. Although our conclusion was based on the statutory provisions, *id.,* at 782–790, we also acknowledged that Title I, like many other federal grant programs, was "much in the nature of a contract." *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981). "The State chose to participate in the Title I program and, as a condition of receiving the

---

[3] In determining compliance with federal grant programs, other Courts of Appeals have consistently applied the legal requirements in effect when the grants were made. See, *e. g., Indiana* v. *Bell,* 728 F. 2d 938, 941, n. 6 (CA7 1984); *North Carolina Comm'n of Indian Affairs* v. *Department of Labor,* 725 F. 2d 238, 239 (CA4 1984); *Woods* v. *United States,* 724 F. 2d 1444, 1446 (CA9 1984); *West Virginia* v. *Secretary of Education,* 667 F. 2d 417, 420 (CA4 1981).

grant, freely gave its assurances that it would abide by the conditions of Title I." 461 U. S., at 790. A State that failed to fulfill its assurances has no right to retain the federal funds, and the Federal Government is entitled to recover amounts spent contrary to terms of the grant agreement. *Id.*, at 791; see *id.*, at 794 (WHITE, J., concurring). In order to obtain the Title I funds involved here, New Jersey gave assurances that the money would be distributed to local education agencies for programs that qualified under the existing statute and regulations. See 20 U. S. C. § 241f(a) (1976 ed.); 45 CFR § 116.31(c) (1972). Assuming that these assurances were not met for the years 1970–1972, see 461 U. S., at 791, the State became liable for the improper expenditures; as a correlative, the Federal Government had, before the 1978 Amendments, a pre-existing right of recovery. *Id.*, at 782, and n. 7.

The fact that the Government's right to recover any misused funds preceded the 1978 Amendments indicates that the presumption announced in *Bradley* does not apply here. *Bradley* held that a statutory provision for attorney's fees applied retroactively to a fee request that was pending when the statute was enacted. This holding rested on the general principle that a court must apply the law in effect at the time of its decision, see *United States* v. *Schooner Peggy*, 1 Cranch 103 (1801), which *Bradley* concluded holds true even if the intervening law does not expressly state that it applies to pending cases. 416 U. S., at 715. *Bradley*, however, expressly acknowledged limits to this principle. "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Id.*, at 720. This limitation comports with another venerable rule of statutory interpretation, *i. e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect. See, *e. g.*, *United States* v. *Security Industrial Bank*, 459 U. S. 70, 79

(1982); *Greene* v. *United States,* 376 U. S. 149, 160 (1964). Cf. *Bradley, supra,* at 721 (noting that statutory change did not affect substantive obligations).

Practical considerations related to the enforcement of the requirements of grant-in-aid programs also suggest that expenditures must presumptively be evaluated by the law in effect when the grants were made. The federal auditors who completed their review of the disputed expenditures in 1975 could scarcely base their findings on the substantive standards adopted in the 1978 Amendments.[4] Similarly, New Jersey when it applied for and received Title I funds for the years 1970–1972 had no basis to believe that the propriety of the expenditures would be judged by any standards other than the ones in effect at the time. Cf. *Pennhurst State School and Hospital, supra,* at 17, 24–25. Retroactive application of changes in the substantive requirements of a federal grant program would deny both federal auditors and grant recipients fixed, predictable standards for determining if expenditures are proper.

Requiring audits to be redetermined in response to every statutory change that occurs while review is pending would be unworkable and would unfairly make obligations depend on the fortuitous timing of completion of the review process. Moreover, the practical difficulties associated with retroactive application of substantive provisions in the 1978 Amendments would be particularly objectionable, because Congress

---

[4] The eligibility requirements for school attendance areas have been altered many times since the years 1970–1972. Changes were made by 1974 Amendments to Title I, and the requirements were modified by regulation in 1976 and again amended in 1978. *Infra,* at 643, and n. 6. The Department issued regulations in 1981 clarifying the requirements of the 1978 Amendments. 34 CFR § 201.51(d)(ii) (1981). Later in 1981, the enactment of Chapter 1, see n. 1, *supra,* superseded the provisions of Title I. Chapter 1 has its own provisions governing eligibility for attendance areas within school districts, see 20 U. S. C. § 3805(b), and these provisions were amended in 1983. See Pub. L. 98–211, § 3, 97 Stat. 1413, 20 U. S. C. § 3805(d) (1982 ed., Supp. I).

expressly intended those Amendments to strengthen the auditing process by clarifying the Department's responsibilities and specifying the procedures to be followed. See *Bell* v. *New Jersey*, 461 U. S., at 789; S. Rep. No. 95–856, at 37, 131; H. R. Rep. No. 95–1137, at 53, 161. We conclude that absent a clear indication to the contrary in the relevant statutes or legislative history, changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants.

## III

Neither the statutory language nor the legislative history indicates that Congress intended the substantive standards of the 1978 Amendments to apply retroactively. Congress adopted the amendments as part of a general reauthorization of Title I that did not depart from the program's basic philosophy, but instead sought to clarify and simplify provisions concerning implementation. H. R. Rep. No. 95–1137, at 2, 8; S. Rep. No. 95–586, at 2, 8, 130. The substantive provisions of the 1978 Amendments to Title I were expressly made applicable for grants between October 1, 1978, and September 30, 1983. 20 U. S. C. § 2702. See also Pub. L. 95–561, § 1530, 92 Stat. 2380 (provisions shall take effect on October 1, 1978, "[e]xcept as otherwise specifically provided in this Act"). The House Report similarly stated that the changed requirements were intended to clarify "the manner in which school districts *are to distribute* Title I funds among eligible schools and children." H. R. Rep. No. 95–1137, at 21 (emphasis added). Thus, both the general purpose of the 1978 Amendments and the more specific references in the statute and legislative history suggest that the new requirements were intended to apply prospectively.

The Court of Appeals did not rely on evidence from the legislative history to conclude that the 1978 Amendments in general have retroactive effect. Instead, the court below observed that the amendments to the school attendance area

eligibility requirements "were designed to correct regulations that frustrated the basic objectives of the Title I program." 724 F. 2d, at 36–37. This observation mischaracterizes both the regulations in effect prior to 1976 and the provisions adopted by Congress in 1978. Regulations adopted in 1967, see 32 Fed. Reg. 2742, and in effect for nearly 10 years, generally restricted Title I assistance to school attendance areas having a percentage of low-income children at least as high as the districtwide average. *Supra,* at 636; see also Office of Education, Title I Program Guide No. 44, ¶ 1.1 (1968) (explaining eligibility requirements). This requirement deliberately channeled funds to the poorest areas within any particular school district. One consequence of this comparative approach, however, was that a school located in a disadvantaged district might be ineligible for assistance even though it would have qualified if it were located in a wealthier district.[5] Although later changes in the eligibility standards attempted to mitigate this incidental effect,

---

[5] Of course, relatively poor school districts would receive a greater districtwide allocation of Title I funds because this amount was determined by the number of poor children within the district. This fact is illustrated by the present case: for the period from September 1, 1970, to August 31, 1973, Newark was allocated more than $28 million in Title I funds, or 18.4% of New Jersey's total allocation. App. 14.

Moreover, from the outset of the Title I program, the regulations provided that in certain circumstances an entire school district could qualify as a Title I project. 45 CFR § 116.17(b) (1966). This alternative responded to indications by Congress that districtwide eligibility might be appropriate for particularly impoverished areas. See S. Rep. No. 146, 89th Cong., 1st Sess., 9 (1965) ("There may be circumstances where a whole school system is basically a low-income area and the best approach in meeting the needs of educationally deprived children would be to upgrade the regular program"); H. R. Rep. No. 1814, 89th Cong., 2d Sess., 3 (1966) ("[W]hen 30 or 40 percent of the children in the school district are from low-income families, all of the children in the district could be considered disadvantaged and the whole school system could be upgraded").

We do not address whether the Secretary correctly determined that Newark did not qualify for districtwide eligibility under the legal provisions in effect during the years 1970–1972. See *supra,* at 637.

they do not indicate that the earlier regulations conflicted with the policies of Title I.

During consideration of 1974 Amendments to Title I, a House Committee observed that inflexible application of the existing regulations might make schools with high proportions of low-income children ineligible. H. R. Rep. No. 93–805, p. 17 (1974) ("[I]t was never intended by the Act to render any school with a 30% concentration ineligible"). Although the 1974 Amendments made changes in the school eligibility requirements, they did not specifically address this situation.[6] Apparently prompted by the concerns of Congress, the Department modified its regulations in 1976 to permit a school attendance area to qualify for funds if more than 30% of its children were from low-income families, even though the districtwide average might exceed 30%. See 42 Fed. Reg. 42914, 42917 (1976), codified in 45 CFR § 116a.20 (b)(2) (1977); National Institute of Education, Title I Funds Allocation: The Current Formula 57, 109 (1977). The 1978 Amendments refined this alternative by lowering the percentage to 25% and requiring the school district to guarantee that state and federal funding for compensatory education would not be reduced for any other school attendance area that received Title I funds in the preceding year. 20 U. S. C. § 2732(a)(1).

The evolution of the school eligibility requirements no doubt reflects a reassessment of the proper means to imple-

---

[6] The 1974 Amendments liberalized the eligibility standards by providing that an otherwise ineligible school attendance area would be deemed eligible if it had qualified and received Title I funds in either of the two preceding fiscal years. Pub. L. 93--380, § 101(a)(5)(D), 88 Stat. 500, 20 U. S. C. § 241e(a)(13) (1976 ed.). Furthermore, the 1974 Amendments allowed a local education agency to deem a school attendance area eligible for Title I assistance based on the actual attendance, rather than the residency, of children from low-income families. § 101(a)(5)(B), 88 Stat. 500, 20 U. S. C. § 241e(a)(1)(A) (1976 ed.). See S. Rep. No. 93–763, p. 30 (1974); H. R. Rep. No. 93–805, pp. 16–17 (1974); S. Conf. Rep. No. 93–1026, p. 144 (1974).

ment the goals of Title I. Nonetheless, the changes made since 1976 simply do not support the conclusion of the Court of Appeals and the contention of New Jersey that the earlier regulations were inconsistent with Title I's policies. The regulations in place from 1967 to 1976 targeted assistance to the neediest areas within each school district in conformance with the statutory directive that funds should go to school attendance areas having high concentrations of children from low-income families. See 20 U. S. C. § 241e(a) (1976 ed.). Moreover, available funds never were sufficient to provide services to all eligible students, H. R. Rep. No. 95-1137, at 7, and Title I required funds to be concentrated on particular projects rather than diffused among all eligible school attendance areas. See 20 U. S. C. § 241e(a)(1)(B) (1976 ed.); 45 CFR § 116.17(c) (1972). Thus, the school eligibility requirements helped to assure that funds would not be spread so thinly as to impair the effectiveness of particular Title I projects. Cf. H. R. Rep. No. 1814, 89th Cong., 2d Sess., 3 (1966) (suggesting that limited funds should be directed to schools with highest concentrations of children from low-income families); S. Rep. No. 95-856, at 7 ("[T]itle I is successful in directing substantial federal aid to those areas which have the highest proportions of children from low-income families").

Congress did not abandon the concerns underlying the earlier regulations when it enacted the 1978 Amendments. Legislative Reports spoke approvingly of the longstanding policy to direct funds to school attendance areas "having the highest concentrations of low-income families." *Id.*, at 11; H. R. Rep. No. 95-1137, at 21. Although the 1978 Amendments relaxed the eligibility requirements for school attendance areas, the intent was "to give districts more flexibility without watering down the targeting features intended to give the programs a focus when funds are limited." *Ibid.* The 25% eligibility standard was itself the product of a compromise at Conference. The House bill, see *id.*, at 22, 211, but not the Senate amendment, provided that any school

attendance area having a 20% concentration of poor children must be designated as eligible for Title I. H. R. Conf. Rep. No. 95–1753, p. 255 (1978). The Conference agreed to an amendment that made the designation of these areas optional, increased the required percentage to 25%, and provided that other areas must retain the same amount of funds they received the preceding year. *Ibid.* Although it is fair to infer that Congress determined that the targeting features of Title I would not be unduly compromised by adoption of the 25% standard, the background to the 1978 Amendments does not suggest the earlier regulations frustrated the program or that Congress intended the Amendments to apply to prior grants.

## IV

New Jersey urges that we affirm the holding below on the ground that the Court of Appeals reached an equitable result. The determination by the Secretary does not question the good faith of New Jersey or the Newark School District with respect to the disputed expenditures, which we acknowledge might be permissible under standards enacted in 1978 or currently in effect.[7] Nonetheless, we find no inequity in requiring repayment of funds that were spent contrary to the assurances provided by the State in obtaining the grants. Particular cases might appear to present exceptions to this rule, but given the statutory and administrative framework for assuring compliance with the requirements of Title I, we do not think recognizing such

---

[7] New Jersey contends that 10 of the disputed attendance areas had concentrations of low-income children exceeding 25%, and under the 1978 standards, the State is liable for a minimum of $249,607. As the Court of Appeals noted, 724 F. 2d, at 37, the 1978 standards would not be satisfied if compensatory funding was not maintained at prior-year levels in other schools receiving Title I aid. *Ibid.* The present record leaves unclear whether this requirement was satisfied, *ibid.*, and the possibility that the necessary information is no longer available merely underscores the practical problems resulting from retroactive application of changes in the eligibility requirements. Brief for Petitioner 46, and n. 37.

exceptions is within the province of the courts. Congress has already accommodated equitable concerns in the statutory provisions governing recovery of misused funds. Those provisions limit liability for repayment to funds received during the five years preceding the final written notice of liability, 20 U. S. C. § 884 (1976 ed.), repealed and replaced by 20 U. S. C. § 1234a(g), and authorize the Secretary, under certain conditions, to return to the State up to 75% of any amount recovered. § 1234e(a). Of course, if Congress believes that the equities so warrant, it may relax the requirements applicable to prior grants or forgive liability entirely. The role of a court in reviewing a determination by the Secretary that funds have been misused is to judge whether the findings are supported by substantial evidence and reflect application of the proper legal standards. *Bell* v. *New Jersey*, 461 U. S., at 792. Where the Secretary has properly concluded that funds were misused under the legal standards in effect when the grants were made, a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome. Cf. *Bennett* v. *Kentucky Dept. of Education, post,* at 662–663.

Because the Court of Appeals has not yet addressed New Jersey's arguments that the demanded repayment does not reflect proper application of the standards in effect during 1970–1972, the State may renew these contentions on remand. Accordingly, the decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

The Elementary and Secondary Education Act of 1965, 79 Stat. 27, was a part of the broader program that President

Johnson characterized as the "war on poverty." [1] Title I of the Act authorized the expenditure of large sums of federal money to improve the education of children in low-income areas. The statute, however, did not contain a specific definition of the schools that would qualify for assistance under the program. It merely stated that "payments under this subchapter will be used for programs and projects . . . (A) which are designed to meet the special educational needs of educationally deprived children in school attendance areas having high concentrations of children from low-income families. . . ." 20 U. S. C. § 241e(a)(1) (1976 ed.).

As the case comes to us, the underlying issue is whether 10 of the public schools in Newark, New Jersey,[2] that received federal assistance in the 1971–1972 school year were located "in school attendance areas having high concentrations of children from low-income families" within the meaning of the Act as it was enacted and as it was clarified by subsequent amendments. If funds were incorrectly allocated to those schools, the total federal grant was not increased; instead, the consequence was a lower distribution to other Newark schools that admittedly qualified for federal aid.[3] There is

---

[1] Cf. S. Rep. No. 146, 89th Cong., 1st Sess., 4 (1965) ("'Poverty will no longer be a bar to learning, and learning shall offer an escape from poverty. We will neither dissipate the skills of our people, nor deny them the fullness of a life informed by knowledge. And we will liberate each young mind—in every part of this land—to reach the furthest limits of thought and imagination'") (statement of President Johnson).

[2] The original dispute between the parties involved 10 elementary schools and 3 high schools. If the Court of Appeals' disposition were accepted, the determination of ineligibility for two elementary schools and for one high school would no longer be at issue. See *State of New Jersey, Dept. of Education* v. *Hufstedler*, 724 F. 2d 34 (CA3 1983); Brief for Respondent 15–16, n. 12 (acknowledging that, under the Third Circuit's decision, it would have to repay "to the Secretary a minimum of $249,607"); *id.*, at 16–17, n. 13.

[3] The Title I funds allotted to the New Jersey State Department of Education for the 3-year period between September 1, 1970, and August 31, 1973, aggregated $156,166,574. Of this total, $28,709,198 was suballotted to the Newark School District. There was no question about the total

no dispute about the fact that the money that was allocated to these schools—like that allotted to over 60 other schools in Newark—was used in programs and projects properly designed to meet the special educational needs of educationally deprived children.[4] The only "misuse" of federal funds that is at issue is the suggestion that the money should have been spent in different school-attendance areas. The remedy for this misuse is not a redistribution to the more needy areas, but is a recapture of the funds by the Federal Government.

The Court agrees that the areas in dispute would have qualified for federal assistance under the statute as amended in 1978, and under the Secretary's regulations that are now in effect. *Ante,* at 645. I think the Court would also agree that the Secretary had authority under the original Act to issue the regulations that are in effect today; indeed, in 1976 the Secretary did issue regulations that would have qualified seven of the attendance areas that are now in dispute.[5] As the case comes to us it is also clear that we must assume that none of the disputed areas qualified under the Secretary's regulations that were in effect in 1971–1972.[6] Thus, the

---

amount of money that either New Jersey or Newark was entitled to receive. The only question at issue in this case is whether Newark distributed some of that money to the wrong schools. *Ante,* at 636; Brief for Petitioner 4, n. 1 ("[T]he Newark school district received its correct allocation of Title I funds"); Brief for Respondent 5; App. 14.

[4] Brief for Petitioner 9 ("[T]he principal issue in the audit was the method of calculating eligibility of school attendance areas in 1971–1972").

[5] The "low-income percentage" as determined by the federal auditors for the 10 disputed school-attendance areas ranged from a low of 27.9% to a high of 33.5%. In seven of these areas the figure was in excess of 30%. The auditors also disqualified two elementary-school-attendance areas with percentages of 22.9% and 20.6% and one high-school-attendance area with a percentage of 13%. App. 23–24. The determinations for those three areas would apparently no longer be in dispute if the Court of Appeals' decision were affirmed. See Brief for Respondent 15–16, n. 12, 16–17, n. 13. See also n. 3, *supra.*

[6] New Jersey argued that, if the children who were not attending school and those who were attending special schools in the area were counted, the

question for decision is whether the legal standard that should govern the disposition of this controversy is to be derived from the Secretary's regulations in effect during the 1971–1972 school year—which admittedly were violated—or from the statutory language, which plainly was broad enough to authorize these expenditures when the statute was first enacted in 1965 as well as after its amendment in 1978.

The Court holds that the now repudiated regulations must be strictly enforced. I agree with the Court's view that the fact that its holding produces an inequitable outcome does not authorize a reviewing court to depart from the controlling legal standard,[7] but I am convinced that the Court has seriously misread the intent of Congress.

I

In order to understand the impact of the regulations that must be strictly enforced under the Court's holding—and which I submit Congress later repudiated—it is useful to set forth the relevant facts concerning one of the school-attendance areas where federal money was allegedly "misused." The federal auditors disallowed expenditures of $104,842 for special programs at Newark's South 17th Street Elementary School. The disallowance was based on a determination that only 33.5% of the 1,549 children in the school were from low-income families.[8] Because the average percentage of children from low-income families in the entire

---

correct percentage of the low-income children in most of the attendance areas would be increased. Thus, for example, in the attendance area of the South 17th Street Elementary School, the low-income percentage would be 40.3%. See App. to Pet. for Cert. 53a; for purposes of decision, I assume that argument was correctly rejected by the auditors. However, I note that New Jersey has represented that the poverty level in the attendance area of the South 17th Street Elementary School had risen to 73.91% in 1984–1985. See Brief for Respondent 8, n. 5.

[7] *Ante*, at 646; cf. *Trans World Airlines, Inc.* v. *Franklin Mint Corp.*, 466 U. S. 243, 277 (1984) (STEVENS, J., dissenting).

[8] App. 23, 25.

Newark School District was slightly higher—33.9%—the South 17th Street Elementary School did not satisfy one of the eligibility criteria in the Secretary's regulations.[9] Under those regulations, unless the entire Newark School District qualified for assistance, only those school-attendance areas in which the percentage exceeded the districtwide average could qualify. Thus, even though South 17th Street's percentage of 33.5 would have qualified for federal aid in any other school district in New Jersey and, indeed, in almost any school district in the entire United States,[10] it did not meet the Secretary's rigid standard.

---

[9] Title 45 CFR § 116.17(d) (1972) then provided:

"A school attendance area for either a public elementary or a public secondary school may be designated as a project area if the estimated percentage of children from low-income families residing in that attendance area is as high as the percentage of such children residing in the whole of the school district, or if the estimated number of children from low-income families residing in that attendance area is as large as the average number of such children residing in the several school attendance areas in the school district. In certain cases, the whole of a school district may be regarded as an area having a high concentration of such children and be approved as a project area, but only if there are no wide variances in the concentrations of such children among the several school attendance areas in the school district."

[10] It is undisputed that Newark's poverty level was one of the highest in the Nation. New Jersey offers the following description:

"The Newark School District for the years 1970 through 1973, the period covered by the federal audit before this Court, could readily be characterized as the prototypic Title I district. The application for Title I funds for the year 1971–72 school year, the primary focus of the audit, showed that 33.9% of the children in the Newark School District were from low-income families (J. A. 108). The narrative portion of this application clearly demonstrated that Newark was uniformly disadvantaged in other ways. Statistics showed a jobless rate in 1970 of 14%; a rate which was double that needed to qualify under the Economic Development Act. Another 35,000 residents were earning $3,000 per year or less. In 1971, the Model Cities program in Newark was expanded to include the entire city. At the time the 1971–72 application was submitted, Newark had a black population of 54.2% with another 11% of its population of hispanic background. The City also had the highest percentage of slum housing in the nation, the

When the anomalous consequences of this regulation came to the attention of Congress during its consideration of amendments to the Act in 1974, the House Committee on Labor and Education issued a Report that expressed the opinion that "it was never intended by the Act to render any school with a 30% concentration ineligible." [11] Presumably it was that Report that prompted the Secretary to modify the regulations in 1976 to permit school-attendance areas with more than 30% of the children from low-income families to qualify even though the districtwide percentage was even higher. [12] Regardless of whether that is a correct explanation

---

highest incidence of crime per 10,000 population, the highest population density, a high rate of maternal mortality and the second highest birth rate. Of particular significance to the Title I program, and exacerbating the inherent difficulties of obtaining precise statistics for Newark's low-income population, was the fact that in 1970–71 Newark had the highest population turnover in the nation. Indeed, Model Cities data indicated that mobility rates reached as high as 80% for schools in the Title I area (J. A. 113 to J. A. 114; J. A. 69)." Brief for Respondent 3–4 (footnote omitted).

[11] The quoted statement appears in the following paragraph from H. R. Rep. No. 93–805, p. 17 (1974):

"As originally conceived and as extended, Title I authority is basically centered in the local educational agency (the school district). The special needs of the educationally disadvantaged child and programs to meet those needs must be locally devised. This is consistent with the Congress' historical concern that local communities should, not in conflict with constitutional and legal prescriptions, formulate educational policy. . . . This is not consistent with strict Federal administration regulations which so narrowly define 'target school' that a school in one local educational agency with 10% of its enrollment of 'educationally deprived' is an eligible 'target school,' whereas a school in another local educational agency with 30% or more is not eligible as a target school. While it is clearly the expressed objective to serve children in schools with high concentrations, it was never intended by the Act to render any school with a 30% concentration ineligible."

[12] See 45 CFR § 116a.20(b)(2) (1977), which stated, in pertinent part:

"An attendance area may be designated under paragraph (b)(1) on a percentage basis if the percentage of children from low-income families in that attendance area is at least as high as the percentage of such children

of the regulatory change in 1976, it is significant that the Secretary then interpreted the 1965 Act as allowing a school in a 30% area to qualify even though its attendance area had a lower percentage than the districtwide average.

In its consideration of the 1978 Amendments, Congress plainly expressed its disapproval of the kind of interpretation of the 1965 Act that is reflected in the regulations involved in this case. One example, described in the hearings before the Subcommittee on Elementary, Secondary and Vocational Education, provides a precise analogue to this case:

> "In Baltimore City any school district which has less than 30.3% Title I children was not eligible to receive Title I funds. This minimum is higher than the maximum incidence in schools receiving Title I funds in 11 other counties. This means there are schools in relatively affluent counties receiving Title I assistance with no more than 5% Title I children while schools in Baltimore City with 25–30% Title I children are excluded from the program." [13]

In response to testimony of that kind, Congress amended the statute to make it clear that a local school district could designate any attendance area with a 25% incidence of poverty as eligible for Title I funds. The House Report explained the purpose of the change (which originally proposed a reduction to 20%):

> "[C]urrent OE regulations [45 CFR § 116a–20(b)(2)] provide that any school attendance area with 30 percent

residing in the whole of the school district. In addition, upon specific request by the local educational agency, the State educational agency may approve the designation of attendance areas in which at least 30 percent of the children are from low-income families."

[13] Education Amendments of 1977: Hearings on H. R. 15 before the Subcommittee on Elementary, Secondary and Vocational Education of the House Committee on Education and Labor, 95th Cong., 1st Sess., pt. 12, p. 392 (1978) (testimony of Ruth Mancuso, vice president of the National Association of State Boards of Education).

or more children from low-income families (based on
eligibility for free lunch) may be designated a target
area. . . . The Committee bill reduces this minimum to
20 percent out of a concern that inflexible targeting
requirement could force some school districts with very
high incidences of poverty to declare school[s] with 20
percent low-income enrollment ineligible, while schools
with only 10 percent low-income enrollment or less might
be eligible in wealthier neighboring districts." [14]

When Congress amended the Act in 1978 to provide that
any school-attendance area would be eligible for federal
assistance if at least 25% of its children were from low-income
families, it did not change the basic eligibility standard that
had been adopted in 1965. Thus, the statute as amended in
1978, like the statute prior to those Amendments, provides
that a "local educational agency shall use funds received
under this subchapter in school attendance areas having high
concentrations of children from low-income families (herein-
after referred to as 'eligible school attendance areas')." 92
Stat. 2161, 20 U. S. C. § 2732(a)(1). In adding the specific
provision that a local educational agency may designate any
school-attendance area in which at least 25% of the children
are from low-income families, Congress did not broaden that
standard, but merely ensured that the Secretary would not
improperly narrow it. Thus, the only practical effect of
the 1978 Amendments was to deny the Secretary the legal
authority to promulgate the kind of rigid regulation that is
being strictly enforced today.

## II

In my opinion this is plainly a case for application of the
normal rule that a reviewing court must apply the law in
effect at the time of its decision. As JUSTICE WHITE cor-
rectly noted when this litigation was before the Court two
Terms ago:

[14] H. R. Rep. No. 95–1137, p. 22 (1978).

"A federal court or administrative agency must 'apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.' *Bradley* v. *Richmond School Board*, 416 U. S. 696, 711 (1974). Accord, *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473, 486, n. 16 (1981). Here, nothing in the 1978 Amendments or the legislative history suggests that the Amendments were not intended to be applied retroactively, and their application to this case would not result in manifest injustice." *Bell* v. *New Jersey*, 461 U. S. 773, 793–794 (1983).

In my view, it is the Court's holding, rather than an application of the 1978 Amendments to this case, that results in manifest injustice.

Ever since the statute was enacted in 1965 Congress has expressed a strong preference for allowing broad discretion to local governmental units in the administration of these federally funded programs.[15] We should therefore adopt a strong presumption supportive of a local school board's decision concerning the proper allocation of money among different school-attendance areas subject to its jurisdiction.[16] Finally, it is appropriate to note that, just as the 1978 Amend-

---

[15] See, *e. g.*, S. Rep. No. 146, 89th Cong., 1st Sess., 9 (1965), which stated:

"It is the intention of the proposed legislation not to prescribe the specific type of programs or projects that will be required in school districts. Rather such matters are left to the discretion and judgment of the local public educational agencies. . . . What may be an acceptable and effective program in a school district serving a rural area may be entirely inappropriate for a school district serving an urban area, and vice versa. There may be circumstances where a school system is basically a low-income area and the best approach in meeting the needs of educationally deprived children would be to upgrade the regular program. On the other hand, in many areas the needs of educationally deprived children will not be satisfied by such an approach."

[16] There is, of course, an important distinction between the broad *power* of Congress to control certain actions of state governmental units, see,

ments themselves protected local school districts from overly prescriptive federal regulations, Congress in 1981 again identified the same interest in further amendatory legislation. Thus, the Education Consolidation and Improvement Act in 1981 directed that federal assistance be provided "in a manner which will eliminate burdensome, unnecessary and unproductive paperwork and free the schools of unnecessary federal supervision, direction and control," 95 Stat. 464, and specifically indicated that federal assistance of the kind involved in this case would be most effective "if educational officials, principals, teachers,. and supporting personnel are freed from overly prescriptive regulations and administrative burdens which are not necessary for fiscal accountability and make no contribution to the instructional program." *Ibid.*[17]

In sum, I simply cannot understand how the Court reaches the conclusion that its disposition of this case accords with the intent of Congress.

Accordingly, I respectfully dissent.

---

*e. g., EEOC* v. *Wyoming,* 460 U. S. 226, 244–248 (1983) (STEVENS, J., concurring), and the proper interpretation of congressional action which presumptively should accord state governmental units the broadest measure of respect. See, *e. g., New York Telephone Co.* v. *New York Dept. of Labor,* 440 U. S. 519, 539–540, 545–546 (1979) (opinion of STEVENS, J.).

[17] This thought was echoed in a recent study, which noted that one "Title I administrator compared the current federal Title I role to 'the people who hide in the mountains until the war is over and then come down to kill the dead.'" L. McDonnell & M. McLaughlin, Education Policy and the Role of the States 105 (1982).