**STATE OF WASHINGTON; Spokane School District No. 81, Petitioners,**

v.

**U.S. DEPARTMENT OF EDUCATION, Respondent.**

No. 88–7195.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 1989.

Decided June 5, 1990.

Robert W. Winston, Jr., Spokane, Wash., for petitioners.

Ronald B. Petracca, Office of General Counsel, U.S. Dept. of Educ., Washington, D.C., for respondent.

Before BROWNING, ALARCON and HALL, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

We review the determination of the United States Department of Education that in fiscal year 1981–82 the State of Washington and the Spokane School District violated the requirement of the Education of the Handicapped Act, 20 U.S.C. §§ 1400–1485, that federal funds be used only to supplement and not to supplant state or local funds for the education of handicapped

children, *id.* § 1414(a)(2). We affirm in part, reverse in part and remand.

## I

The Education of the Handicapped Act "represents an ambitious federal effort to promote the education of handicapped children." *Board of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). Under the Act, states are responsible for providing "a free appropriate public education," 20 U.S.C. § 1412(1), including special education and related services, *id.* § 1401(18); *see id.* § 1401(16), (17), to all handicapped children. Recognizing that this responsibility would entail increased costs, Congress provided funding to defray the *additional* costs of educating handicapped children. *See id.* § 1414(a)(1). A state meeting the requirements of the Act receives federal funds based on the number of handicapped children receiving special education and related services multiplied by a percentage of average per pupil expenditure in the United States. *Id.* § 1411(a).[1]

The Act includes provisions, particularly § 1414(a)(2)(B), to ensure federal funds are used to defray the excess cost of educating handicapped children and to supplement or increase, not diminish, the amount spent by the state for this purpose. This litigation concerns the proper application of § 1414(a)(2)(B) and the Department's regulation interpreting it, 34 C.F.R. § 300.230 (1988). Pertinent parts of both are set out in the margin.[2]

## II

Prior to and during the 1980–81 fiscal year, the Spokane School District taught handicapped children in self-contained classrooms. Participating children spent approximately 72 percent of their school time in such classrooms, receiving both special and regular educational instruction. Because self-contained classrooms were not available in all schools, extensive transportation of participating children was necessary.

The Association of Retarded Citizens of the State of Washington challenged Spokane's use of self-contained classrooms as violative of the "least restrictive environment" requirement of the Act. *See* 20 U.S.C. § 1412(5)(B). In response, Spokane

1. To receive any money at all, a state must spend a "minimum average amount." 34 C.F.R. § 300.184 (1988). Once that is spent, however, federal funds are not matched to state spending or apportioned except per capita.

2. 20 U.S.C. § 1414(a) provides in pertinent part:
   (a) *Requisite features*
   A local educational agency ... which desires to receive payments under section 1411(d) of this title for any fiscal year shall submit an application to the appropriate State educational agency. Such application shall—

   (2) provide satisfactory assurance that—

   (B) Federal funds expended by local educational agencies and intermediate educational units for programs under this subchapter—
   (i) shall be used to pay only the excess costs directly attributable to the education of handicapped children; and
   (ii) shall be used to supplement and, to the extent practicable, increase the level of State and local funds expended for the education of handicapped children, and in no case to supplant such State and local funds....
   34 C.F.R. § 300.230 provides in pertinent part:
   (a) Each application [by a local educational agency] must provide assurance satisfactory to the State educational agency that the local educational agency uses funds provided under Part B of the Act to supplement and, to the extent practicable, increase the level of State and local funds expended for the education of handicapped children, and in no case to supplant those State and local funds.
   (b) To meet the requirement in paragraph (a) of this section:
   (1) The total amount or average per capita amount of State and local school funds budgeted by the local educational agency for expenditures in the current fiscal year for the education of handicapped children must be at least equal to the total amount or average per capita amount of State and local school funds actually expended for the education of handicapped children in the most recent preceding fiscal year for which the information is available. Allowance may be made for:
   (i) Decreases in enrollment of handicapped children; and
   (ii) Unusually large amounts of funds expended for such long-term purposes as the acquisition of equipment and the construction of school facilities; and
   (2) The local educational agency must not use Part B funds to displace State or local funds for any particular cost.

adopted a program to teach all but the most severely handicapped children in regular classrooms in local schools. This change, requiring an additional one-time expenditure of $250,000 in fiscal year 1980–81, was implemented in fiscal year 1981–82. The proportion of school time handicapped children spent in self-contained classrooms dropped from 72 to 32 percent, and busing was substantially reduced. As a result, the district spent less for the special education of handicapped children in fiscal year 1981–82 than it had in fiscal year 1980–81.

In 1983, the Department audited Spokane's use of funds for the education of handicapped children during the 1981–82 fiscal year to determine whether, as required by the Act, federal funds had been used "to supplement and, to the extent practicable, increase the level of State and local funds expended for the education of handicapped children, and in no case to supplant such ... funds." *Id.* § 1414(a)(2)(B)(ii). The Department compared the amount spent by Spokane in fiscal year 1980–81 with the amount spent in fiscal year 1981–82 on both a total and an average per capita basis. It found state funds spent in fiscal year 1981–82 were less under both calculations, and concluded federal funds had been used to "supplant" state funds in violation of the statute and regulation.

The State of Washington and Spokane appealed to the Education Appeal Board. The Board ultimately found Spokane had supplanted $407,884 in state funds with federal funds.

### III

Spokane does not dispute the Department's finding it spent $407,884 less on the education of handicapped children in fiscal year 1981–82 than in 1980–81. Spokane also agrees with the Department that the statute and regulation prohibit using federal funds to displace state and local funds for particular costs. Spokane contends no more is required—that so long as it does

not use federal funds to displace state and local funds for particular costs, the statute and regulation are satisfied.

As a practical matter, typically a local educational agency that reduces its level of expenditures while the level of federal funds remains unchanged will use federal funds to displace state spending on particular costs. In this instance, Spokane argues, because only the former occurred— that is, because the decrease in spending on the education of handicapped children in fiscal year 1981–82 was due to the discontinuation of self-contained classrooms and related busing and not to the displacement of local funds by federal funds to pay a particular cost—federal funds did not supplant state and local funds.

The Department, on the other hand, argues the statute and regulation prohibit local agencies from using federal funds to displace state and local funds *and* require local agencies to maintain at least the same level of fiscal effort each year.

As Spokane points out, § 1414 does not specifically require maintenance of effort, as do some comparable statutes, *see, e.g.,* Basic Education for Adults Act, 20 U.S.C. §§ 1206b(2), 1209(b); and the regulation interpreting the statute can be read as creating a pre-grant screening device and nothing more—that is, as requiring that the amount "budgeted" by state and local agencies be equal to past expenditures, but not going further and penalizing agencies that do not spend the entire amount budgeted, provided federal funds are not actually used to displace local funds in paying particular costs.[3]

Although the statute does not specifically require maintenance of effort, neither does it specifically prohibit displacement of state funds by federal funds for particular costs. The Department's interpretation of the statute to include both is reasonable. The House Labor and Education Committee has reported congressional approval. *See* H.R.Rep. No. 410, 98th Cong., 1st Sess.

---

3. Spokane argues that since the amount it budgeted for fiscal year 1981–82 was more than the amount spent in the most recent fiscal year for

which actual expenditures were known (1979–80), there was no violation.

21, *reprinted in* 1983 U.S.Code Cong. & Admin.News 2088, 2108 (the "current regulations which govern [grant] programs under [the Act] have received the strong support of Congress"). The Department has long read maintenance-of-effort requirements into similar statutes. *See Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 661, 671, 105 S.Ct. 1544, 1553, 84 L.Ed.2d 590 (1985) (Education Appeal Board concluded that statutory provision mandating federal funds be used "to supplement and, to the extent practical, increase [local funds]" and "in no case, ... to supplant such funds" required the state to maintain its level of fiscal effort); *Indiana Dep't of Public Instruction v. Bell*, 728 F.2d 938, 941 n. 6 (7th Cir.1984) ("[e]ach application for a grant ... shall contain an assurance that the use of grant funds will not result in a decrease in the use ... of State or local funds") (quoting 45 C.F.R. § 116.17(h) (1973)).

■ The statute does more than simply prohibit "supplanting"; it also requires that federal funds be used "to supplement and to the extent practicable, increase" state and local spending. Requiring maintenance of fiscal effort, even though this may require reallocation of funds no longer needed for a particular use, promotes the purpose of the statute. If state or local spending is maintained even when some costs decline, federal funds can be used to fund new programs for handicapped children a local agency could not otherwise afford. *Cf.* 20 U.S.C. § 1401(16) (special education means "specially designed instruction ... to meet the unique needs of a handicapped child"). Spokane's interpretation would allow a local agency to reduce its own expenditures on educating handicapped children without losing federal funds simply by eliminating particular programs. Reading the statute to avoid this result is not unreasonable.[4]

■ Spokane argues that § 300.230 is merely a pre-grant screening device. The Department responds that the regulation provides both pre-grant and post-grant checks to assure that federal funds supplement or increase rather than displace local funds. Pre-grant, state and local educational agencies must budget at or above the level of expenditure for the previous year. Post-grant, they must (1) maintain the same level of yearly expenditures, and (2) not displace local funds with federal funds.[5] The statute speaks in terms of funds "expended." 20 U.S.C. § 1414(a)(2)(B)(ii). Casting the regulation in terms of funds "budgeted" does not alter the statutory requirement; it simply recognizes that in the normal process an application for funds will be submitted and checked for compliance with the statute and regulation in advance of actual expenditure of the funds. The Department's interpretation of its regulation is not plainly erroneous;[6] although the dual requirement imposed by the regulation may restrict a local agency's freedom to allocate funds, it also helps ensure that the purpose of the statute—to provide greater combined state and federal financial resources to educate handicapped children—will not be circumvented.

## IV

■ Section 300.230(b)(1) provides two exceptions to the requirement that local agencies maintain expenditures at or above the level of the previous year. The first is that allowance may be made for "[d]ecreases in enrollment of handicapped children." 34 C.F.R. § 300.230(b)(1)(i).

---

**4.** The Department's interpretation of the statute need not be the only reasonable interpretation or the one we would have arrived at initially; it need only be " 'sufficiently reasonable' to be accepted by a reviewing court." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

**5.** As the comment to § 300.230 notes, the nonsupplanting requirement applies both to aggregate expenditure ((b)(1)) and particular costs ((b)(2)).

**6.** Our review of the Department's application of its own regulation is limited to ensuring the interpretation is not plainly erroneous, inconsistent with the regulation or contrary to congressional intent. *California Dep't of Educ. v. Bennett*, 833 F.2d 827, 830 (9th Cir.1987).

Spokane calculates student enrollment in two ways: (1) the actual number of children enrolled without regard to the portion of a full day each student receives special schooling, and (2) the number of full-time equivalent ("FTE") students. Thus, for enrollment purposes, two handicapped children, each spending half the school day in special education classes, may be counted as two students or as one FTE student.

In fiscal year 1980–81, Spokane had an enrollment of approximately 2480 handicapped children or 1664 FTE students receiving instruction in self-contained classrooms. In fiscal year 1981–82 after Spokane implemented its new system, actual enrollment remained essentially constant, dropping from 2480 to 2385, but the number of FTE students fell substantially, from 1664 to 933.

The Department interprets both the test in the body of (b)(1), determining yearly expenditures on an average per capita basis, and the allowance in (b)(1)(i) as applying to the number of actual students rather than the number of FTE students. Spokane argues this interpretation renders (b)(1)(i) superfluous since declining enrollment in actual students is accounted for by the per capita allocation of yearly expenditures in accordance with the body of subsection (b)(1), leaving no function for (b)(1)(i). To avoid this result, Spokane argues, (b)(1)(i) must be read as authorizing an allowance for a decrease in the number of FTE students.

As the Department points out, however, (b)(1)(i) is not rendered superfluous by limiting its applicability to actual students, since it may be used to account for spending reductions, such as building closures or personnel layoffs, occasioned by particularly large declines in enrollment that would not be reflected adequately in the per capita calculation under (b)(1).

Moreover, the Board noted:

Spokane ... was essentially in violation of the "least restrictive environment" requirement for [its] special education pro-gram. While the handicapped students were in self contained, isolated classrooms, [federal] funds were being used both for their basic education and to serve their specialized needs. Once the children were mainstreamed, the financial obligation for their basic education was returned to the district general fund. It is impossible to determine a comparison of FTE figures without knowing how much of the "self-contained" classroom expense should have been allocated to basic education. To use the dollar figures advanced by Spokane is to compare apples and oranges.

Spokane had the opportunity to demonstrate to the Board that its expenditures on special education for fiscal year 1980–81 were overstated because they included expenditures for basic education as well, but it did not.[7] Thus, we accept the Department's determination that the amount spent in that year was spent on special education, obviating the need to account for the decrease in FTE students.

The Department's interpretation of subsection (b)(1)(i) is not plainly erroneous, nor is its application of the regulation to this case.

## V

Under the second exception to the regulation's maintenance-of-effort requirement, allowances may be made for a decrease in spending due to "[u]nusually large amounts of funds expended [in the previous year] for such long-term purposes as the acquisition of equipment and the construction of school facilities." 34 C.F.R. § 300.230(b)(1)(ii). Spokane contends the Department acted unreasonably in denying an allowance under this provision for the one-time expenditure of $250,-000 to finance the shift from self-contained to regular classrooms.

The Department argues Spokane failed to meet its burden of showing the expenditure was long-term or unusually large.

**7.** Spokane admits the high number of FTE students enrolled in 1980–81 resulted from its practice of supplying regular educational services in special education classes contrary to 20 U.S.C. §§ 1412(5), 1414(a)(2)(B)(i).

The only factual finding by the Board on this issue was a statement crediting Dr. Knox's testimony that the expenditure was a one-time transfer to effectuate a permanent change in the district's method of delivering educational services.[8] This finding is supported by substantial evidence, but the Board did not explain how the finding supports its conclusion. No other Board finding explains the Board's rejection of the allowance. Indeed, the record indicates the Board may not have resolved the issue at all.

Since the record does not disclose the grounds upon which the Board based its decision, we are unable to review the reasonableness of that decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). We therefore remand to the Board to make "new or modified findings of fact" on this issue. 20 U.S.C. § 1234g(c).

## VI

 Spokane argues we should order equitable relief from repayment because Spokane acted in good faith. As Spokane itself notes, the Supreme Court has held "the absence of bad faith [does not] absolve[ ] a State from liability if funds were in fact spent contrary to the terms of a grant agreement." *Kentucky Dep't of Educ.*, 470 U.S. at 664, 105 S.Ct. at 1549. Spokane attempts to distinguish *Kentucky Department of Education* on the ground the Department did not find Spokane had displaced local funds. This merely restates Spokane's argument that maintenance of effort is not required. It does not persuade us that we may disregard the clear

Supreme Court directive that equitable relief from repayment is improper.[9] *See Bennett v. New Jersey*, 470 U.S. 632, 645–46, 105 S.Ct. 1555, 1563–64, 84 L.Ed.2d 572 (1985) ("Particular cases might appear to present exceptions to this rule [against equitable relief], but ... we do not think recognizing such exceptions is within the province of the courts.").

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

---

8. In its decision, the Board stated "[Dr. Knox] requested a one-time transfer of $250,000 from the district non-handicapped reserved fund. That money was made available and used during the 1980–81 school year to plan for and effectuate change in the method of delivering educational services to the handicapped."

9. Spokane cites *Tangipahoa Parish School Bd. v. Department of Educ.*, 821 F.2d 1022, 1029–30 (5th Cir.1987), for the proposition equitable re-

lief may be appropriate. We think Spokane misinterprets the language it quotes. The *Tangipahoa* court reversed the Department's decision because the Department failed to follow its own audit procedures, not for equitable reasons. *Id.* at 1029.