**STATE OF CALIFORNIA DEPART-MENT OF EDUCATION, Petitioner,**

v.

**William J. BENNETT, Secretary of Education, United States Department of Education, Respondents.**

No. 86–7274.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 13, 1987.

Decided Oct. 1, 1987.

Joseph R. Symkowick, Chief Counsel, Allan H. Keown and Taylor S. Carey, Staff Counsel, California Dept. of Educ., Sacramento, Cal., for petitioner.

Richard B. Mellman, Office of the General Counsel, U.S. Dept. of Educ., Washington, D.C., for respondents.

Before POOLE and BOOCHEVER, Circuit Judges, and STEPHENS,[*] District Judge.

POOLE, Circuit Judge:

The State of California Department of Education (California) petitions for review of a final decision of the Education Appeal Board holding the state liable for the return of $10,302,130 of overallocated federal grant funds extended under Title I of the Elementary and Secondary Education Act of 1965, as amended, for use in California's migrant education program. California contends that the Secretary of Education lacks the authority to require the repayment of these monies. We disagree and deny the state's petition.

## FACTS

The Migrant Education Program (MEP) was created by the 1966 amendments to Title I of the Elementary and Secondary Education Act of 1965 (ESEA).[1] The MEP provides federal funding for state programs addressing the special educational needs of the migratory children of migratory agricultural workers and fishermen. 20 U.S.C. §§ 2701, 2761–63 (1982). It enables state educational agencies (SEAs) to obtain annual grants from the United States Department of Education (Department)[2] to support their own migrant education programs. 20 U.S.C. § 2761(a). Grants are

---

* Honorable Albert Lee Stephens, Jr., Chief Judge Emeritus, Central District of California, sitting by designation.

1. Pub.L. No. 89–10, 79 Stat. 27 (1965), as amended, 20 U.S.C. §§ 2701 et seq. (1982).

2. The Department of Education, created in 1980, succeeded the Office of Education, and all functions of the Commissioner of Education

were transferred to the Secretary of Education. 20 U.S.C. §§ 3441(a)(1), 3507 (1982). For simplicity, both the Office of Education and the Department of Education are referred to herein as the Department of Education. Similarly, the Commissioner of Education and the Secretary of Education are referred to as the Secretary of Education.

awarded on the basis of a state's average per pupil expenditures and estimated migratory child[3] population. 20 U.S.C. § 2761(b). States' estimated migratory child counts are supplied by their respective SEAs to the Migrant Student Record Transfer System (MSRTS).[4] The Secretary of the Department of Education (Secretary) uses statistics provided by the MSRTS to determine the number of migratory children in a state eligible to participate in Title I programs.[5] 20 U.S.C. § 2761(b).

Petitioner, State of California Department of Education, received Title I migrant education grants for fiscal years 1980, 1981 and 1982.[6] These grants reflected eligibility data it collected and submitted into the MSRTS during calendar years 1978, 1979 and 1980. A subsequent audit by the Department's Office of the Inspector General (OIG) revealed deficiencies in the data submitted by California. The auditors examined a statistically random sample obtained from the MSRTS of 500 migrant children reported by California as residing in California for all or part of the years 1978–1980. They found that eligibility determinations were erroneous in 122 cases and insufficiently documented in an additional 28. Extrapolating from the 122 cases, the OIG concluded that California should refund $24.8 million to the Department. It added that the additional 28 cases entitled the Department to a further refund of $5.5 million. Conceding that 38 of the 122 children could not be proven eligible, California submitted additional documentation to OIG in an attempt to substantiate the eligibility of the remainder. After reviewing this information, OIG maintained that 119 children in the sample were ineligible and recommended the return of $25 million.

In his Final Letter of Determination of February 28, 1984, the Assistant Secretary for Elementary and Secondary Education substantially revised the OIG's findings. He nonetheless concluded that 50 of the 500 children in the sample, including the 38 whose eligibility California had not contested, could not be proven eligible for participation in California's migrant education program and that California owed the Department $10,432,500 in overallocated funds, a figure reduced by subsequent recalculation to $10,302,130. The Education Appeal Board (Board), in its December 9, 1985 Initial Decision, upheld this determination. When the Secretary, after receiving written comments from both sides, opted neither to modify nor set aside the Board's decision, the Board's Initial Decision became its Final Decision on March 17, 1986. See 20 U.S.C. § 1234a(d)(1982). California timely appealed to this court on May 13, 1986. See 20 U.S.C. §§ 1234d, 2851(1982).

## DISCUSSION

### 1

■ California's principal argument is that the Secretary lacks authority to recap-

---

3. The term "migratory child" is defined at 45 C.F.R. Part 116d.2 (1979).

Three sets of Title I MEP regulations were in effect during portions of the period in which California made its eligibility determinations. These regulations were codified at 45 C.F.R. Part 116d and published July 13, 1977, November 13, 1978 and April 3, 1980. (These provisions were subsequently recodified as 34 C.F.R. Part 204 on November 21, 1980.) The changes between sets of regulations are not particularly relevant to this appeal. Thus, herein, the regulations for eligibility and the required documentation for migrant children during the period 1978–80 are cited as 45 C.F.R. Part 116d (1979). The regulations covering the allocation of Title I funds during the FYs 1980, 1981 and 1982 are cited as 34 C.F.R. Part 204 (1981). This approach follows that adopted by the parties in their briefs. It also reflects the Supreme Court's directive that in administering federal grant programs, "obligations generally should be de-

termined by reference to the law in effect when the grants were made." *Bennett v. New Jersey,* 470 U.S. 632, 638, 105 S.Ct. 1555, 1559, 84 L.Ed.2d 572 (1985) (footnote omitted).

4. The MSRTS is a computerized system for storing the education and health records of eligible migrant children. It is administered by the Arkansas Department of Education, under contract with the Department. *See* 20 U.S.C. § 2763.

5. The Secretary is not required to rely on MSRTS data; he may also look to "such other system as he may determine most accurately and fully reflects the actual number of migrant students." 20 U.S.C. § 2761(b).

6. The federal fiscal year runs from October 1 to the following September 30. Thus, Fiscal Year 1980 is October 1, 1979 to September 30, 1980.

ture overallocated funds beyond the fiscal year for which they were made available.[7] Under federal regulations, if the Secretary determines that an SEA's allocation is "more than the amount needed to carry out the activities in its annual program plan," he may reallocate the excess. 34 C.F.R. § 204.22. The Secretary may find that a SEA has received excess funds "[w]hen the Secretary obtains—later in the fiscal year—information that supports a redetermination of the SEA's entitlement." 34 C.F.R. § 204.22(b)(3)[8] The Department waited before conducting its audit until the fiscal years for which the funds were awarded had passed. California contends that the Secretary has thereby forfeited any right he may have had to recoup any overallocation.[9]

We find little merit in California's argument. The regulation California cites describes the means by which surplus funds may be reallocated to where they are needed, not whether the federal government may recover funds that a state had no right to receive in the first place. Moreover, California ignores the existence of statutory and common law authority which provide ample basis for the Secretary's recovery of overallocated and misallocated funds. Section 207(a)(1) of Title I[10] has been interpreted by the Supreme Court as giving "the Federal Government a right to the amount of any funds over paid." *Bell v. New Jersey*, 461 U.S. 773, 783, 103 S.Ct. 2187, 2193, 76 L.Ed.2d 312 (1983). In addition, section 415 of GEPA also provides authority for the Secretary to recover overallocations:

> Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement, *with necessary adjustments on account of overpayments or underpayments, as the Secretary may determine.*

20 U.S.C. § 1226a–1 (emphasis supplied). Referring to the legislative history of this section, the Supreme Court has noted that "the Senate Committee clearly thought that overpayments would lead to a recovery...." *Bell*, 461 U.S. at 784 n. 11, 103 S.Ct. at 2194 n. 11.[11]

■ Alternatively, the Secretary, in the absence of any express statutory authority, may recover overallocated funds under the common law doctrine of payment by mistake. The doctrine permits recapture of funds which the government or its agents have erroneously paid. *Woods v. U.S.*, 724 F.2d 1444, 1448 (9th Cir.1984); *U.S. v. Mead*, 426 F.2d 118, 124 (9th Cir.1970). *Accord, State of W.Va. v. Secretary of Education*, 667 F.2d 417, 419 (4th Cir.1981) (per curiam) (Secretary of Education has

---

**7.** As an initial matter, California raises the argument, which we find meritless, that OIG lacked authority to audit the data filed by the state with the MSRTS. OIG authority to conduct its audit rests upon 20 U.S.C. §§ 2835(a) and 1232f(b).

**8.** The Secretary may also find that a SEA has excess funds when the SEA so notifies the Secretary and when, for the preceeding two fiscal years, the SEA has carried over more than 15 percent of its annual grant. § 34 C.F.R. § 204.22(b)(1)–(2).

**9.** The Department's initial response is that California did not raise this argument before the Board, mentioning it for the first time "in a brief and unhighlighted portion of its initial comments on the EAB decision." "As a general rule," this court, "will not consider an issue raised for the first time on appeal." *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir.1985). Nevertheless, we proceed to address the issue on the grounds that "the issue presented is purely one of law," not requiring additional factual development. *Id.*

**10.** Now codified at 20 U.S.C. § 2841 (1982).

**11.** While it is true that the Supreme Court's holding in *Bell* is directed to the federal government's right to recover "misused funds," 461 U.S. at 775, 103 S.Ct. at 2189, this does not mean that the Department cannot recover funds that it has misallocated, as California urges. In addition to the language from *Bell* quoted above, the Court clearly implied that the federal government can recover misallocated funds, in the absence of a showing of a misexpenditure, when it accepted the proposition that the Department can recover, under section 415, payments made to SEAs "accidentally." *Id.* at 787, 103 S.Ct. at 2195. In addition, the Court made clear that proof of misexpenditure was unnecessary when it stated: "[W]e would find it difficult to believe that Congress meant to permit States to obtain good title to funds otherwise owing to the Federal Government by the simple expedient of spending them." *Id.* at 787–88 n. 15, 103 S.Ct. at 2196 n. 15.

common law authority to recover misspent Title I funds); *Collins v. Donovan,* 661 F.2d 705, 708 (8th Cir.1981); *Mount Sinai Hospital v. Weinberger,* 517 F.2d 329, 337 (5th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). Certainly, the Department did not intend to provide more Title I funds to California than California's documentation allowed. Thus, under either a statutory or common law theory, the Department is correct in its claim that the Secretary can require the repayment of the overallocated funds.[12]

2

■ California further contends that, despite any power the Secretary may have to recover Title I monies, so long as the number of migrant children it estimates are eligible reasonably comports with reality, it adequately complies with statutory and regulatory requirements and is therefore entitled to retain any overallocated funds. In other words, California claims that because it was right about ninety percent of the children it reported as eligible, it should be entitled to keep one hundred percent of the money. We are unable to agree. The Supreme Court has made it clear that the right of the Secretary to recover funds is not affected by a Title I grant recipient's "substantial compliance" with the statutory and regulatory requirements. *Bennett v. Kentucky Dept. of Education,* 470 U.S. 656, 664, 105 S.Ct. 1544, 1549, 84 L.Ed.2d 590 (1985) To us, it seems clear that the right to "estimate" a state's total migratory child population is entrusted to

the Secretary alone. *See* 20 U.S.C. § 2761(b); 45 C.F.R. 116d.21 (1979). Hence, the child count supplied to the MSRTS by the SEA must be accurate. 45 C.F.R. § 116d.12 (1979).[13] Moreover, we are constrained by the Supreme Court's admonition: "Where the Secretary has properly concluded that funds were misused under the legal standards in effect when the grants were made, a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome." *Bennett v. New Jersey,* 470 U.S. 632, 646, 105 S.Ct. 1555, 1563, 84 L.Ed.2d 572 (1985).[14]

3

■ California asserts that its migrant education program will be severely damaged, thus frustrating the MEP's purpose, if federal auditors are allowed to second-guess and overrule determinations with respect to eligibility made by state officials. California offers no proof of its bare assertion. In contrast, the Department argues that while Congress, by enacting the MEP, provided liberal eligibility requirements,[15] it did not free SEAs from accountability. We agree with the Department. The fiscal accountability of Title I grant recipients is an obvious congressional objective. *See, e.g.,* 20 U.S.C. §§ 1232c(a), 1232d, 1232f, 1234a–1234e, 2835, 2836. By not providing proper documentation, California violated 45 C.F.R. § 116d.12 when it counted the fifty children as eligible to receive MEP assistance. On appeal, California does not con-

12. Although the Secretary's authority to recover overallocations is not limited to the fiscal year for which the funds are provided, it may be subject to the five-year limitation period prescribed by 20 U.S.C. § 1234a(f) (1982).

13. The mandatory wording of 45 C.F.R. § 116.12 (1979) makes it abundantly clear that an SEA is not free to estimate its migrant child population. In pertinent part the regulation provides: "An SEA or an operating agency shall not count a child under § 116d.21 or provide program services to that child until the agency has: (a) Determined that the child is either a currently or formerly migratory child, as defined under § 116d.2; and (b) Made a written record of the basis on which the child's eligibility was determined."

14. Because we hold that there is no "substantial compliance" exception to the Secretary's authority to require repayment of overallocated Title I funds, we need not decide whether the Board adequately addressed the question of California's substantial compliance with the reporting requirements. Nevertheless, we note that the Board ruled on the issue and unequivocally rejected the State's claim when it stated that "the Panel does not perceive substantial compliance with the requirement to document without which there is no certifiable eligibility."

15. For example, formerly migratory children are eligible to continue receiving MEP benefits for five years. 20 U.S.C. § 2762(b).

**800**

test that the Board's finding with respect to the fifty cases is supported by substantial evidence. Nor does it dispute the propriety of extrapolating from the sample to the entire state migrant population. We therefore find meritless California's contention that the Secretary's demand for repayment offends public policy.

4

Near the close of argument before the Board, California moved to supplement the record with respect to sixteen of the children whose ineligibility it had previously conceded. The Board declined: "That will not be allowed, sir. You have to at some time fish or cut bait." California contends that the excluded evidence was both material and relevant and that the Board's action violated 5 U.S.C. § 556(d), 34 C.F.R. Part 78, subpart I § 78.51, and the due process clause of the fourteenth amendment. The state also claims that the Board abridged "its fundamental right to a full and fair opportunity to present its case" when it limited oral argument to one day.

■ We reject California's due process claims. The Board has full power to exclude evidence that is irrelevant or immaterial. 34 C.F.R. §§ 78.51, 78.61(a) (1985). *See also* 5 U.S.C. § 556(d). In this case, the proffered evidence was of doubtful relevance: The state had in its final brief conceded ineligibility in the sixteen cases. The issue of these cases was, therefore, not before the Board. Moreover, even if the Board was wrong, petitioner has the burden of demonstrating that the error was prejudicial. *County of Del Norte v. United States*, 732 F.2d 1462, 1467 (9th Cir. 1984); 5 U.S.C. § 706 (1982). California has not discharged this burden.

■ Finally, while it is true that both sides requested two days for oral argument, there is no requirement that the

Board heed the parties' request; whether oral argument is required is left to the discretion of the Board. 34 C.F.R. § 78.71 (1985). We perceive no evidence of abuse and, again, California fails to show how it was prejudiced by the Board's decision.[16]

CONCLUSION

California's petition for relief from the Board's final determination is denied.

**PETITION DENIED.**

16. California contends that if its liability is upheld, any of the state's unexpended MEP funds should be credited against its obligation to the federal government. The Board declined to address this issue, claiming that it lacked sufficient information and that any dispute as to collection was a matter to be negotiated. The Department, in its brief, accepts California's point: The Secretary "will provide the State a credit for unobligated FYs 1980–82 MEP funds if, as the Assistant Secretary previously stated, California returns those amounts to the Department or establishes that it did not draw them from its Federal account." We therefore find the issue to be moot.