**HOUSING AUTHORITY OF THE COUNTY OF KING, Plaintiff,**

v.

**Samuel R. PIERCE, Secretary of the Dep't of Housing and Urban Development, Defendant.**

**Civ. A. No. 88–0495.**

United States District Court, District of Columbia.

Dec. 12, 1988.

Florence Wagman Roisman and Christopher Hornig, Roisman, Reno & Cavanaugh, Washington, D.C., on briefs, John D. Blankinship, Montgomery, Purdue, Blankinship and Austin, Seattle, Washington, for plaintiff.

Arthur R. Goldberg and Eric J. Segall, Civil Div., Dept. of Justice, on briefs, John R. Bolton, Asst. Atty. Gen., Dept. of Justice, and Jay B. Stephens, U.S. Atty., Gershon Ratner, Howard M. Schmeltzer and Carl A. Tibbets, U.S. Dept. of Housing and Urban Development, Washington, D.C., of counsel, for defendant.

CHARLES R. RICHEY, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff, the Housing Authority of the County of King ("HACK"), is a federally subsidized, nonprofit corporation organized under the laws of the State of Washington. HACK's mission is to provide affordable housing to low-income tenants, with federal assistance, under the United States Housing Act of 1937. 42 U.S.C. § 1437 *et seq.* The Defendant, the United States Department of Housing and Urban Development ("HUD"), administers the Housing Act, and supervises funding for the numerous housing authorities similar to HACK currently operating around the nation. As described in greater detail below, a dispute arose in 1983 between HUD and HACK over such funding. HUD claimed that from 1981 to 1983 HACK received more money than it should have. Accordingly, HUD set in motion mechanisms designed to recover the purported overpayment. In this lawsuit, HACK does not challenge the merits of HUD's overpayment claim, but instead attacks HUD's decision, in moving forward with its recoupment scheme, not to comply with the administrative review provisions of the Federal Claims Collection Act (the "Act"), 31 U.S.C. § 3701 *et seq.*, and HUD's departmental review provisions established pursuant to the Act, contained at 24 C.F.R. § 17.100 *et seq.* HACK contends that HUD is required by law to comply with the Act and the regulations in recovering overpayments in the manner HUD has chosen, and that, under the circumstances of this case, the failure to do so works a denial of HACK's right to due process under the Fifth Amendment. For the reasons described below, this Court rejects HACK's arguments and grants summary judgment in favor of HUD.

## FACTUAL BACKGROUND

HACK, as a public housing authority operating pursuant to the Housing Act of 1937, receives annual operating subsidies from Congress. HUD supervises the payment of these subsidies. The annual subsidies, which are paid in advance of the period they are intended to cover, are designed to correspond to the difference between the

recipient's projected annual operating expenses and the recipient's projected annual income. The shortfall between a public housing authority's expenses and its income arises principally from the fact that, in setting rents, the public housing authority typically may not charge over thirty per cent of the tenant household's income. 42 U.S.C. § 1437(a).

In 1983, HUD's Office of the Inspector General for Audit ("OIG") determined that HACK's annual subsidies for the years 1981–83 had been established pursuant to faulty criteria, and therefore concluded that HACK's subsidies had been substantially more than they should have been for that period.[1] HUD initially notified HACK of its position on November 9, 1983. Apparently matters sat dormant for some time thereafter, until, in a letter dated August 6, 1986, Harold E. Saether of HUD's Seattle office reiterated HUD's position that HACK had been over-subsidized, and asked HACK to recompute its utility allowances pursuant to HUD's suggested criteria. HACK refused to do so on the grounds that HUD's criteria were inapplicable. As a result, on February 6, 1987, Mr. Saether notified HACK that HUD itself had recomputed the amount of the overcompensation to be $570,611, and that if that sum were not paid within 30 days, HUD would "collect the debt by administrative offset under the provisions of 24 C.F.R. § 17.60 et seq." [2] HACK then wrote directly to HUD's headquarters in Washington. HACK's letter, dated February 27, 1987, challenged HUD's decision, and, as part of the administrative review to which

it considers itself entitled under the Act and 24 C.F.R. § 17.10 et seq., HACK requested a hearing in Washington and the production of relevant documents pursuant to 24 C.F.R. § 17.105.

In response to inquiries into the status of its request for a hearing and the production of documents, HACK initially received only a letter from HUD, dated May 4, 1987, stating that HUD was reviewing all material associated with the matter. Finally, on February 6, 1988, J. Michael Dorsey, HUD's General Counsel, advised HACK that, despite Mr. Saether's previous representations, the "recapture" of the excess subsidies would not be effected pursuant to 24 C.F.R. 17.10 et seq.[3] Instead, according to Mr. Dorsey, the recapture would occur pursuant to the authority granted HUD under 24 C.F.R. § 990.110(e). That provision allows HUD to adjust the annual subsidy of a public housing authority either upward or downward "as a result of data subsequently available to HUD which alters projections upon which the approved operating subsidy was based." Mr. Dorsey's letter noted that because the recapture of HACK's excess subsidies would occur pursuant to § 990.110(e), HUD would not be bound by the administrative review provisions of 24 C.F.R. § 17.10 et seq. By its terms, 24 C.F.R. § 990.110(e) makes no reference to any right of administrative review of a HUD decision to adjust annual subsidies. Accordingly, Mr. Dorsey's letter denied HACK's request for a hearing and the production of documents, and ad-

---

1. The thrust of the dispute over the calculation of the HACK's subsidies, the accuracy of which is not at issue in this action, relates to the prediction of HACK's utility expenses for the 1981–83 period. HACK and HUD disagree over which of the OIG's regulations should have controlled the prediction of HACK's utility expenses. HUD contends that HACK relied on superseded regulations containing criteria which overestimated the expected utility expense, and therefore caused HACK's annual subsidies during the relevant period to be too great. HACK contends that it properly relied upon the regulations in effect at the time. Although this question will no doubt be resolved by some court somewhere, the issue of which regulation and which criteria should have controlled the

determination of HACK's utility expenses during the pertinent period is not at issue here.

2. In prior correspondence, HACK had asked for advice from HUD as to any administrative review procedures available before challenging HUD's determination in Court. HUD had also responded at that time, in a September 16, 1988, letter from Mr. Saether, that following final HUD action HACK would enjoy the right to appeal to HUD headquarters "pursuant to 24 C.F.R. Part 17."

3. HUD intends to "recapture" the excess payments to HACK by reducing the annual subsidies HACK would otherwise receive over the next five years by $510,611.

vised HACK that steps would begin immediately to recapture the excess payments.

HACK filed this suit on February 25, 1988. HACK alleges: (1) that HUD is required by law to afford HACK the administrative procedures contained in the Act and at 24 C.F.R. § 17.10 *et seq.* before implementing its "recapture" program; and (2) that, even if HUD is not required to comply with the Act and the regulations promulgated thereunder, its failure to afford HACK formal review procedures constitutes a denial of HACK's due process rights under the Fifth Amendment. The Court addresses HACK's contentions in turn.

### ANALYSIS

I. HUD IS NOT REQUIRED TO COMPLY WITH THE ACT OR THE REGULATIONS PROMULGATED THEREUNDER PRIOR TO IMPLEMENTING ITS RECAPTURE PROGRAM

█ In essence, HACK contends that HUD's proposed scheme to recoup the excess payments constitutes an "administrative offset" as contemplated by both the Act and HUD's regulations promulgated thereunder, and that HUD violated each by not satisfying their procedural requirements prior to implementing the scheme.[4] Although both parties devoted much paper and energy to briefing other, related issues, in the Court's view the dispositive issue on this point is whether the Act and HUD's administrative offset regulation, by

their express terms, apply in this situation. The Court finds that they do not.

At 31 U.S.C. § 3701, the Act's definitional section, the term "person" as it used in § 3716 is expressly held *not* to include "an agency of the United States Government, of a State government, or of a unit of general local government."[5] HUD's administrative offset regulation contains an identical exclusion. 24 C.F.R. § 17.100(a). Thus, before HACK can argue that HUD was in any way bound to comply with the terms of either the Act or HUD's regulations, HACK must show that it is not "an agency ... of a State government, or ... a unit of general local government."

This, it is clear from the record, HACK cannot do. Under the laws of the State of Washington that authorize the creation and regulation of public housing authorities, it is manifestly apparent that HACK, if not an agency of the State of Washington, is at least a unit of general local government, and thus beyond the parameters of the Act and HUD's administrative offset regulations. Title 35, sections 35.82.010–.910 of the Revised Code of Washington describe the creation and regulation of public housing authorities. These provisions make clear that public housing authorities in Washington are created at the pleasure of either city or county officials, 35 R.C.W. § 35.82.030, and that these officials are charged with the appointment of commissioners to operate the housing authorities. 35 R.C.W. § 35.82.040. City or county officials have the power to remove commissioners for cause. 35 R.C.W. § 35.82.060.

---

**4.** An "administrative offset" is defined at 31 U.S.C. 3701(a)(1) as "withholding money payable by the United States Government to, or held by the Government for, a person to satisfy a debt the person owes the Government." The provision of the Act relating to administrative offset is 31 U.S.C. § 3716. It states that the head of an executive or legislative agency "may collect by administrative offset only after giving the debtor—

(1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

(2) an opportunity to inspect and copy the records of the agency related to the claim;

(3) an opportunity for a review within the agency of the decision of the agency related to the claim; and

(4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim."

Section 3716(b) requires the head of each agency to promulgate regulations governing the implementation of administrative offset by that agency. HUD has done so at 24 C.F.R. §§ 17.-100–.118.

**5.** Section 3716 authorizes the employment of administrative offset only after an agency has attempted to collect a claim from a "person" under Section 3711(a). As a practical matter, then, the Act only authorizes offset against a "person" as defined in Section 3701.

Housing authorities have the authority to conduct hearings on matters material to their operation, and to issue subpoenas ordering attendance at such hearings and the production of documents. 35 R.C.W. § 35.82.070(8). They also have the power of eminent domain over private property. 35 R.C.W. § 35.82.110. In the apparent opinion of the Washington legislature, it was necessary that public housing authorities enjoy these powers, and that local officials retain control over the authorities' exercise of these powers, because of the "essential government functions" housing authorities perform. 35 R.C.W. § 35.82.010.

Although any interpretation of the language of the Act and HUD's administrative offset regulation is clearly a matter of federal law, the functions and powers of housing authorities, as articulated and defined by statute, inform the federal law determination in this context. Here, HACK's state law powers make clear that HACK is, if not an agency of state government, at least a "unit of local government" within the meaning of the Act and HUD's administrative offset regulation.[6] Accordingly, neither apply in this case, and HUD was not bound to comply with their express procedural requirements before deciding to implement its recoupment scheme.

 Having departed from the statutory and regulatory scheme, however, matters become less clear. HACK argues that, absent the express authorization to undertake administrative offset contained in the Act and HUD's regulation, HUD has no authority to undertake its recoupment scheme. In essence, HACK argues that a general common law right of government agencies to undertake specific, extra-statutory recoupment mechanisms such as that proposed by HUD does not exist, and that express statutory authorization is a precondition to the implementation of any such scheme.[7] As HACK notes, the Supreme Court "pretermitted" this issue in *Bell v. New Jersey,* 461 U.S. 773, 782 n. 7, 103 S.Ct. 2187, 2193 n. 7, 76 L.Ed.2d 312 (1983), by finding that the statute at issue in that case did authorize non-litigation recoupment.

Absent a definitive statement from the Supreme Court, this Court finds substantial support for the proposition that HUD enjoys the common law right to recoup, in the manner proposed, the funds erroneously advanced to HACK,[8] and rejects HACK's assertion that the Act or HUD's regulations have somehow displaced or

---

**6.** HACK's citation to decisions of Washington courts on the question of whether public housing authorities are "state agencies" under Washington law is inapposite. The issue is whether the statutory entities authorized by 35 R.C.W. § 35.82.010 *et seq.* are, for federal law purposes, "units of local government" under the Act and HUD's regulation. The fact that the courts of Washington are uncertain as to whether these entities are "state agencies" under state law, while not clearly irrelevant to the federal analysis, is nearly so. On the other hand, the working, functional *powers* of these entities, as vested by state statute, are clearly relevant and largely dispositive of the federal law issue.

**7.** HACK rejects HUD's reliance on 24 C.F.R. § 990.110(e) as authorization for its recoupment scheme on two grounds. First, HACK contends that, by its terms, § 990.110(e) does not apply to this type of situation. Section 990.110(e) permits HUD to adjust an annual subsidy "as a result of data subsequently available ... which alters projections upon which the approved operating subsidy was based." HACK contends that the utilization of the wrong regulation as a basis for formulating its projection, which allegedly occurred here, does not fall within this

language. Although the question is not free from doubt, the Court defers to HUD's perfectly rational contention that this language does permit recoupment under these circumstances. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). Second, HACK contends that, even if § 990.110(e) covers this situation, it is invalid because as the Housing Act nowhere expressly authorizes this type of recoupment. This contention, of course, goes to the heart of the dispute over a common law right of recoupment; in light of this Court's conclusion that such a right exists, the Court need not address the issue of whether the Housing Act authorizes § 990.110(e). *Cf. Collins v. Donovan,* 661 F.2d 705 (8th Cir.1981) (regulation authorizing offset "merely codifies" common law right).

**8.** Note that this conclusion in no way implies that HUD enjoys the common law right to recoup without affording constitutionally adequate process. Whether HUD in fact afforded due process in this case is addressed later in this opinion.

modified that right. The federal government's common law right to recoup erroneously disbursed funds is firmly established and has been consistently recognized. *See, e.g., State of California v. Bennett,* 829 F.2d 795 (9th Cir.1987); *Bechtel v. Pension Benefit Guaranty Corporation,* 781 F.2d 906 (D.C.Cir.1986) *aff'ing* 624 F.Supp. 590 (D.D.C.1984); *Woods v. United States,* 724 F.2d 1444 (9th Cir.1984); *Mt. Sinai Hosp. v. Weinberger,* 517 F.2d 329 (5th Cir.1975). *Cf. United States v. Wurts,* 303 U.S. 414, 416, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). The variation in the above cases as to the *manner* of recoupment, which HACK cites as somehow limiting HUD's recoupment options, instead appears to this Court to underscore the breadth of the common law remedy.[9]

Two of the foregoing decisions are particularly instructive. In *Bechtel,* the Pension Benefit Guaranty Corporation undertook to satisfy the ERISA obligations of a defunct steel company. Several years after the PBGC had begun payments to the company's ex-employees, the PBGC realized that the level of payments had been incorrectly calculated at the outset, and that the recipients had received more than they should have. Accordingly, the PBGC notified the recipients that it would recoup the amount of the overpayment by reducing subsequent monthly payments—in essence, the method of recoupment that HUD proposes here. The employees in *Bechtel* challenged the PBGC's authority to undertake the recoupment scheme, alleging that ERISA's specification of a particular right of offset for payments made prior to the termination of a plan (29 U.S.C. § 1345), abrogated the more general common law right of recoupment.

The Court of Appeals for the District of Columbia, affirming the District Court, disagreed with the employees. The Court found that, absent an express legislative abrogation of the federal government's

"general right of recoupment," there exists a presumption that the federal government may recover, in the manner employed in that case (as well as in the instant case), funds inadvertently dispersed. 781 F.2d at 907. In this Court's view, Congress has not specifically abrogated HUD's common law right to undertake the proposed recoupment scheme; accordingly, the presumption identified by the Court of Appeals in *Bechtel* applies here as well.

Similarly, in *Mt. Sinai,* the Secretary of Health, Education and Welfare (now Health and Human Services) determined that Mt. Sinai Hospital had received $6.3 million more in Medicare payments than it should have received. The Secretary notified Mt. Sinai of its intention to freeze future Medicare payments to the hospital to offset the amount claimed. Mt. Sinai sued to enjoin the offset, arguing that the Social Security Act's complex administrative scheme—including a provision allowing offset against *beneficiaries,* but nothing permitting offset against a provider, such as the hospital—abrogated the common law right.

The Fifth Circuit disagreed. The court stated that Congress had intended to retain the common law right, and noted, in a point of particular relevance here, that the "recoupment right does not always fit consistently and logically into the statutory system, but the alternative of no right to recoup produces even more severe incongruities." 517 F.2d at 338. The court also emphasized that "[p]rovisions apparently contrary to the government's right to recoup serve important functions that complement rather than displace or supersede the recoupment right." *Id.*

Here, although HUD's right to undertake its recoupment scheme perhaps lacks express statutory authorization, and may not fit smoothly among the legislative provisions squarely addressing the federal government's right to recoup funds errone-

**9.** HACK perhaps inadvertently underscores this point when, in seeking to distinguish several of the common law recoupment cases cited by HUD in which the federal government initiated litigation to recover the misallocated sums, rather than the method at issue here, HACK states that "these cases illustrate the ready alternative HUD has to its illegal offset attempt." This Court agrees that litigation is a ready *alternative* avenue for recoupment, but rejects the implication that these cases somehow limit the availability of the route HUD has chosen.

ously disbursed, it is nevertheless this Court's view that the right does exist in this case. Rather than displacing it, the Act and HUD's offset regulation serve to complement that right. HUD is entitled, assuming that it is correct in assessing the existence and amount of the overpayment,[10] to recover the overpayments from HACK by reducing by appropriate amounts the level of HACK's future annual subsidies.[11]

## II. HUD DID NOT INFRINGE UPON HACK'S DUE PROCESS RIGHTS IN ARRIVING AT ITS FINAL DECISION

 HACK argues that, even if HUD is not obligated to comply with the specific procedures contained in the Act and HUD's offset regulation, HUD at least bears the burden of providing constitutionally sufficient procedure before implementing its recoupment scheme. This Court agrees.[12] The issue then becomes whether HUD *has* respected HACK's rights under the Fifth Amendment in arriving at its determination here. This Court holds that it has.

Due process in this context does not require adherence to a set procedural formula for arriving at a final agency determination of HACK's rights. *See Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) ("due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.") (*quoting Cafeteria Workers v. McElroy*, 367

U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Koch, *Administrative Law and Practice*, § 7.22 (1985) ("The exact procedures to be derived from the due process requirement will vary depending upon the particular situation being examined."). At a minimum, however, a "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333, 96 S.Ct. at 901.[13] The substance of this requirement is set forth in *Mathews'* classic paradigm of due process—constitutionally adequate procedure is based upon an evaluation of (1) the magnitude of the interest at stake, (2) the risk of an erroneous decision pursuant to current procedures and the value of additional procedure, and (3) the government's interest in the current procedure in light of the costs, fiscal and administrative, of additional procedure. *Id.* at 335, 96 S.Ct. at 902.

Applying these criteria to the instant case, the Court finds that HUD's procedure satisfied the duties imposed by the Fifth Amendment. Concededly, there is little question that HUD's recoupment scheme will have a substantial impact upon HACK's operating budget for the next five years, and therefore implicates a substantial interest. This fact, however, must be weighed against the *nature* of the dispute between HACK and HUD. Unlike that presented in the typical due process context, the dispute here is essentially *legal*, not factual.[14] It is accepted that where an

---

**10.** It is worth repeating, however, that this question is *not* before the Court.

**11.** HACK's citation to *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), and *Maryland Dep't of Human Resources v. Dep't of HHS*, 763 F.2d 1441 (D.C.Cir.1985), are not helpful with respect to the question before the Court. In both cases, the issue was the nature of the *statutory* remedy available to the agency seeking recoupment; accordingly, the question was one of *statutory* and *regulatory* construction. Here, HUD asserts a common law right of recoupment. While the teachings of each—in particular Judge Bork's very useful discussion of an agency's obligation to define the level of services that the refunding entity must provide during the course of the recoupment—might and perhaps should guide HUD in the course of the recovery here, this Court does

not view either decision as dispositive of the question presented.

**12.** The Court rejects HUD's suggestion that HACK, as a state entity, lacks the right to due process protections under the Fifth Amendment.

**13.** Stated differently, "[b]efore an agency makes a decision of any kind against any person, it should, in absence of a good reason why not, inform that person of the facts and reasons and listen to or read what he has to say." Davis, *Administrative Law*, § 13.5 (2d ed. 1979).

**14.** In a nutshell, HACK accepts that in projecting its utility costs for the relevant period, it applied the projection criteria which HUD now contends were inapplicable. It also agrees that under the criteria which HUD alleges *should*

administrative dispute requires little or no factual development for resolution, abbreviated procedure is constitutionally acceptable. *See, e.g., Beth Rochel Seminary v. Bennett*, 825 F.2d 478, 482 (D.C.Cir.1987) ("No constitutional right to a hearing arises where the dispositive facts are not in dispute."); *Sullivan v. Carignan*, 733 F.2d 8, 9–10 (1st Cir.1984) (full hearing not required where dispositive facts not in dispute).

Accordingly, under these circumstances, HUD's failure to conduct a formal hearing before finalizing its decision—the purported deficiency at the center of HACK's complaint—cannot be said to have deprived HACK of its right to due process. Under the *Mathews* analysis, the provision of a formal hearing would have added little or nothing to the accuracy of the decisionmaking process. In rendering its final decision, HUD (both in Washington and Seattle) had before it and considered [15] extensive written submissions of HACK's counsel describing HACK's position; it is therefore difficult to see how the benefits of a formal hearing would have justified its costs. By its nature, HUD's decision did not require a detailed investigation followed by trial-type findings of fact. HUD had all that it needed to make a fair decision—it appears to have understood quite well the nature of HACK's objections—and the absence of a hearing or additional process in no way impugns the accuracy of that decision. *See Equia v. Tompkins*, 756 F.2d 1130, 1138 (5th Cir.1985) ("when a determination is for the most part based upon objective documentary evidence, there is less reason to fear that lack of a formal hearing will result in an erroneous decision"). Accordingly, under *Mathews*, and particularly in light of the nature of HUD's decision, this Court concludes that HACK has been provided with all of the process to which it is constitutionally entitled under the Fifth Amendment.

Moreover, even if HUD's procedures prior to the filing of this lawsuit had been constitutionally deficient, following the filing of the complaint HUD appears to have offered HACK a hearing before an agency official who possessed the authority to issue a final decision, as well as all non-privileged documents responsive to HACK's request, in return for a stay of this litigation. HACK refused the offer. In so refusing a tender of constitutionally sufficient process, HACK may well have waived its right to complain of a due process violation before this Court. *See, e.g., Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.1982) ("[A government agency] cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them.").

## SUMMARY

To summarize: Because neither the Act nor HUD's administrative offset regulation apply in this case, because HUD retains the common law right to recoup the overpayments to HACK in the manner proposed, and because HUD complied with the requirements of due process in arriving at its decision to recover the purported overpayments from HACK, summary judgment is granted in HUD's favor.

have been applied, it would have received much smaller annual subsidies. The nub of the controversy, then, is legal—which criteria should HACK have employed?

15. Although HACK complains that it has no proof that its extensive submissions were ever actually considered by those at HUD with the power to make final decisions, the correspondence from HUD to HACK suggests otherwise. In a letter dated May 4, 1987, from James Baugh of HUD's Washington headquarters to HACK's counsel, Mr. Baugh confirmed that HUD was "currently reviewing all material associated with the matter." In addition, in the February 4, 1988, letter referred to above from J. Michael Dorsey to HACK's counsel, Mr. Dorsey noted that "this matter has been considered at the highest levels of this Department." HACK has offered nothing to suggest that these statements are anything but accurate, and that all of HACK's submissions were fully considered by the appropriate authorities within HUD.