909 F.2d 1320
 CHICANO EDUCATION AND MANPOWER SERVICES, Petitioner,
v.
UNITED STATES DEPARTMENT OF LABOR, Respondent.
SEATTLE-KING COUNTY EMPLOYMENT AND TRAINING CONSORTIUM
(Hereinafter "Consortium"), Petitioner,
v.
UNITED STATES DEPARTMENT OF LABOR, Respondent.
 Nos. 88-7187, 89-70208.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 4, 1990.
Decided July 27, 1990.
 
 Steve Fredrickson, Evergreen Legal Services, Seattle, Wash., for petitioner Chicano Educ. and Manpower Services.
 Robert H. Alsdorf, Armstrong, Alsdorf, Bradbury & Maier, Seattle, Wash., for petitioner Seattle-King County Employment and Training Consortium.
 Charles I. Hadden, Anne Payne Fuggett and Jeffrey A. Hennemuth, U.S. Dept. of Labor, Washington, D.C., for respondent.
 Petition for Review of a Decision of the United States Department of Labor.
 Before WRIGHT, WALLACE and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 Chicano Education and Manpower Services (CEMS) and the Seattle-King County Employment and Training Consortium (Consortium) petition for review of a decision of the Secretary of Labor holding them jointly and severally liable for repayment of funds spent in violation of Department of Labor regulations. This is the latest episode in the Department's seven-year quest to recover $105,000 it spent on adult education.
 
 Facts
 
 2
 CEMS was a nonprofit educational corporation funded under the Comprehensive Employment and Training Act of 1973 (CETA), as amended and now repealed, 29 U.S.C. Secs. 801-999 (Supp. V 1981).[1] CEMS received its funding from its prime sponsor, the Consortium, which in turn was the direct recipient of CETA funding from the Department of Labor.
 
 
 3
 In November 1976, CEMS director Jose A. Correa hired Joanna Elizondo as a substitute instructor, a job at which she worked for eight days. At the end of this employment, Correa encouraged Elizondo to apply for a permanent position as a public service employment instructor. Correa hired Elizondo for this position in January 1977.
 
 
 4
 During an investigation of CEMS operations in late 1982, the Department of Labor discovered that Ms. Elizondo was the daughter of Victor Elizondo, CEMS' chairman of the board. The Office of Inspector General concluded that Ms. Elizondo's employment violated CETA's anti-nepotism regulation, and recommended that all payments associated with that employment be disallowed. The Consortium and CEMS were given an opportunity to respond, and on October 18, 1983, the grant officer issued his final determination, upholding the disallowance of $104,954.74 in wages and fringe benefits Ms. Elizondo received between November 1976 and June 1983, when her father resigned as chairman. The grant officer instructed the Consortium to arrange for repayment of the disallowed costs.
 
 
 5
 CEMS and the Consortium sought review of the grant officer's determination before an administrative law judge. Following a hearing, the ALJ issued his decision in February 1985. Although he found that CEMS had violated the CETA nepotism regulation, the ALJ concluded that the equities of the case precluded the government from collecting the disallowed costs associated with Ms. Elizondo's employment. In particular, the ALJ found that CEMS' violation was inadvertent, that CEMS hired Ms. Elizondo because she was the best available candidate emerging from normal application and job announcement procedures, and that she was "especially well qualified for the position." He concluded that "[h]er hiring under such circumstances was in the best interest of the CEMS program and as a consequence the monies for her salary from the CETA grant funds were expended in the exact manner for which they were intended." ALJ Decision and Order (Feb 13, 1985) at 5.
 
 
 6
 The grant officer filed exceptions to the ALJ's decision with the Secretary of Labor, serving both CEMS and the Consortium. The Secretary stayed the proceedings pending a decision in Brock v. Pierce County, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).[2] Following that decision, the Secretary set a briefing schedule in August 1986. CEMS and the grant officer filed briefs; the Consortium did not.
 
 
 7
 The Secretary issued her final decision and order on March 14, 1988. She adopted the ALJ's determination that CEMS had violated the CETA nepotism regulation, but concluded that the ALJ should not have considered the equities. The Secretary therefore ordered CEMS to reimburse the Department of Labor $104,954.74. The Consortium was not named as a party to this decision or held liable for repayment of the funds.
 
 
 8
 CEMS filed a timely petition for review. In December 1988, the Department moved to remand the case to the Secretary to permit her to amend the final decision and order to name the Consortium as an additional party responsible for repayment of the disallowed costs. CEMS opposed the motion. On January 20, 1989, another panel of this court granted the motion.
 
 
 9
 On remand, the Secretary issued a show cause order to which both CEMS and the Consortium responded. The Secretary issued an order on March 6, 1989, finding that the failure to include the Consortium in her 1988 decision was an inadvertent omission. The Secretary amended that decision to hold the Consortium jointly and severally liable along with CEMS for repayment of the funds.
 
 
 10
 The Consortium petitioned for review of the Secretary's amended decision, and we consolidated the two appeals.
 
 Discussion
 I. Nepotism
 
 11
 At the time CEMS employed Joanna Elizondo, the CETA anti-nepotism regulation read:
 
 
 12
 No grantee, subgrantee, contractor or employing agency may hire a person in an administrative capacity, staff position or public service employment position funded under the Act if a member of his or her immediate family is employed in an administrative capacity for the same grantee or its subgrantees, contractors, or employing agencies.
 
 
 13
 29 CFR Sec. 98.22(a) (1976). The ALJ concluded that Victor Elizondo was "employed in an administrative capacity" with CEMS at the time his daughter was hired, and that her employment therefore violated the regulation. The Secretary adopted this determination.
 
 
 14
 CEMS argues that this determination was in error. It claims that Mr. Elizondo was not "employed" by CEMS because he served in a voluntary position as chairman of the board, and that he was not in an "administrative capacity" as that term was defined by CETA regulations.
 
 
 15
 The ALJ, and therefore the Secretary, rejected both of these arguments. We will reverse the Secretary's decision if it was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. Sec. 706(2)(A) (1982). In reviewing the Secretary's decision we show great deference to her interpretation of her own regulations. Such an interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation. Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Blackfeet Tribe v. Dept. of Labor, 808 F.2d 1355, 1357 (9th Cir.1987). The Secretary's interpretation need not be the only one permitted by the regulation, only a reasonable one. Udall, 380 U.S. at 4, 85 S.Ct. at 795. We review the Secretary's findings of fact for substantial evidence. Blackfeet Tribe, 808 F.2d at 1357; 29 U.S.C. Sec. 817(b) (Supp. V 1981).
 
 
 16
 The Secretary determined that the term "employed" does not necessarily refer to one who works for money, but might be interpreted in the more general sense of "to put to use or service." Secretary's Final Decision (March 14, 1988) at 4, quoting The American Heritage Dictionary. In this sense, the chairman of the board is employed by CEMS. There are many situations where individuals perform work on a voluntary basis but are nevertheless considered employees of the organization for a variety of purposes. We cannot say that the Secretary's interpretation of her own regulation was unreasonable.
 
 
 17
 CETA regulations defined "person in an administrative capacity" as:
 
 
 18
 those persons who have overall administrative responsibility for a program, including: all elected and appointed officials who have any responsibility for the obtaining of and/or approval of any grant funded under the Act as well as other officials who have any influence or control over the administration of the program, such as the project director, deputy director and unit chiefs; and persons who have selection, hiring, placement or supervisory responsibilities for public service employment participants.
 
 
 19
 29 CFR Sec. 98.22(b)(3) (1976). CEMS contends that during the time of Ms. Elizondo's employment, all employment decisions were made by Jose Correa, the executive director, and not by the board of directors or Mr. Elizondo as its chairman. This argument ignores the obvious fact that the definition is not limited to those with responsibility over employment decisions. Moreover, the Secretary determined that, regardless of whether Mr. Elizondo was involved in personnel decision making, the board of directors retained overall administrative responsibility as contemplated by the regulation. Indeed, it is undisputed that the executive director reported to the board, that the board had the power to hire and fire the executive director, and that the corporate by-laws gave the chairman of the board responsibility for such duties as the execution of contracts for the corporation. We thus see no reason to disturb the Secretary's determination that Mr. Elizondo was employed in an administrative capacity by CEMS at the time CEMS hired his daughter, and that CEMS violated the CETA anti-nepotism regulation for the period of Ms. Elizondo's employment from November 1976 to June 1983.
 
 II. Special Circumstances
 A. The Viability of Quechan
 
 20
 CETA section 106(d)(2), 29 U.S.C. Sec. 816(d)(2) (Supp. V 1981), requires that the Secretary order repayment of funds spent in public service employment programs[3] in violation of certain statutory sections and regulations, including the nepotism regulation. Repayment may be excused, however if, "in view of special circumstances as demonstrated by the recipient, the Secretary determines that requiring repayment would not serve the purposes of attaining compliance with such sections [of CETA]." Id.
 
 
 21
 In Quechan Indian Tribe v. Dept. of Labor, 723 F.2d 733 (9th Cir.1984), we read this language as requiring the Secretary to consider whether such special circumstances exist before ordering repayment. Although we affirmed the Secretary's determination that the Tribe had violated CETA regulations, we remanded for the Secretary to consider the equities of the Tribe's case. Id. at 736.
 
 
 22
 Here, the ALJ read Quechan as requiring him to consider the equities of CEMS' case. The Secretary reversed the ALJ's decision, holding that in light of subsequent Supreme Court authority, Quechan was no longer controlling. The Secretary pointed out that in Bennett v. New Jersey, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), and Bennett v. Kentucky Dept. of Education, 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), the Supreme Court held that where an agency has properly determined that funds were misspent, a reviewing court has no independent authority to excuse repayment based on a consideration of the equities. See Secretary's Final Decision (March 14, 1988) at 6, quoting Bennett v. New Jersey. From this, the Secretary concluded that she was not required to consider the equities before ordering repayment. Id. at 7.
 
 
 23
 The Secretary reads the Bennett cases too broadly. Those cases stand for the proposition that a reviewing court cannot consider the equities when there is a clear statutory violation and the agency imposes a legal sanction. The Bennett cases concern the power of the courts; they do not speak to what may be required of agencies. In Quechan, we read CETA Sec. 106(d)(2) as requiring the Secretary to consider whether special circumstances exist to justify a discretionary waiver of repayment. That rule is not affected by intervening cases that hold that we, as a court, have no inherent authority to consider such circumstances on our own. See Onslow County, North Carolina v. Dept. of Labor, 774 F.2d 607, 614 n. 9 (4th Cir.1985) ("We only exercise the power in judicial review to enforce a claimant's statutory right to have agency discretion exercised--up or down."). Moreover, in the Bennett cases, the Court held that the statute at issue, Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. Sec. 241a et seq. (Supp. V 1970), provided no indication that grantees could avoid repayment by demonstrating good faith. 470 U.S. at 665, 105 S.Ct. at 1550. In contrast, CETA explicitly contemplates the existence of special circumstances that may excuse repayment.
 
 
 24
 To implement the "special circumstances" language of the statute, the Secretary promulgated 20 CFR Sec. 676.88(c) (1979). See 44 Fed.Reg. 19990, 20035 (April 3, 1979); City of Camden v. Dept. of Labor, 831 F.2d 449, 453 (3d Cir.1987); Action, Inc. v. Donovan, 789 F.2d 1453, 1459-60 (10th Cir.1986). This regulation outlines the conditions under which the grant officer may waive repayment:
 
 
 25
 Allowability of certain questioned costs. In any case in which the Grant Officer determines that there is sufficient evidence that funds have been misspent, the Grant Officer shall disallow the costs, except that costs associated with ineligible participants and public service employment programs may be allowed when the Grant Officer finds:
 
 
 26
 (1) The activity was not fraudulent and the violation did not take place with the knowledge of the recipient or subrecipient; and
 
 
 27
 (2) Immediate action was taken to remove the ineligible participant; and
 
 
 28
 (3) Eligibility determination procedures, or other such management systems and mechanisms required in these regulations, were properly followed and monitored; and
 
 
 29
 (4) Immediate action was taken to remedy the problem causing the questioned activity or ineligibility; and
 
 
 30
 (5) The magnitude of the questioned costs or activities is not substantial.
 
 
 31
 20 CFR Sec. 676.88(c).
 
 
 32
 The Department is, of course, required to follow its own regulations. See Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Memorial, Inc. v. Harris, 655 F.2d 905, 910-11 n. 14 (9th Cir.1980). In his final determination, the grant officer did not discuss the application of 676.88(c) to the costs associated with Ms. Elizondo's employment, and the Secretary did not consider this regulation in her final decision. The Secretary must apply section 676.88(c) in determining whether special circumstances exist under section 106(d)(2).
 
 
 33
 CEMS argues that the Secretary should also consider several other facts about the Elizondo case that militate against repayment. In exercising her discretion to excuse repayment, the Secretary may consider many facts; she is only required to consider the facts relevant to section 676.88(c). That regulation is the Secretary's implementation of the special circumstances exception to 106(d)(2) of CETA, the exception we recognized in Quechan. The Secretary's interpretation of the statute is entitled to substantial deference. See Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). It need not be the only permissible interpretation; it need only be "sufficiently rational." See Chemical Manufacturers Assn. v. NRDC, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).
 
 
 34
 The Secretary's interpretation is certainly rational. CETA creates a presumption in favor of repayment: "[T]he Secretary shall ... order the repayment of misspent funds...." 29 U.S.C. Sec. 816(d)(2) (emphasis added). The exception to this rule is narrow: "unless ... the Secretary determines that requiring repayment would not serve the purposes of attaining compliance with such sections." Id. Section 676.88(c) limits waiver of repayment to situations where there has been no fraud, the recipient demonstrates its good faith in monitoring and remedying the problem, and the costs are not substantial. Under such circumstances, an order of repayment for violation of CETA rules would have little deterrent value; repayment "would not serve the purposes of attaining compliance." The regulation is thus a reasonable interpretation of the special circumstances exception, and we will not substitute our own judgment for the Secretary's. Our conclusion is bolstered by the fact that CETA gives the Secretary the power to determine when special circumstances exist. On remand, the Secretary need only apply section 676.88(c) in determining whether to excuse repayment.[4] That having been said, we note that the facts found by the ALJ strongly support a waiver in this case; the Secretary would not be betraying her responsibility to the taxpayers if she were to waive recoupment on the basis of factors not covered by the regulation.
 
 B. Waiver
 
 35
 The Department argues that CEMS has waived its right to now ask for an exercise of discretion under CETA section 106(d)(2) because it did not ask the grant officer to exercise such discretion. But the ALJ considered the equities--with no objection from the Department that the right to the exercise of such discretion had been waived. Nor did the Department make the waiver argument to the Secretary.[5] More important, we review the decision of the Secretary, not the grant officer, and the Secretary based her decision on her conclusion that Quechan was no longer controlling, not on CEMS' failure to ask for consideration of special circumstances. The Secretary erred as a matter of law, and we therefore remand so that she may consider whether special circumstances exist to justify excuse of repayment.
 
 III. Addition of the Consortium
 
 36
 On March 6, 1989, the Secretary amended her 1988 final decision and order to correct "an inadvertent omission" and add the Consortium as a liable party. Secretary's Order (March 6, 1989) at 3, 4. This amendment was entirely within the Secretary's power.
 
 
 37
 In American Trucking Assns., Inc. v. Frisco Transportation Co., 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958), the Supreme Court asserted the "well recognized" principle that administrative officers and tribunals "have the power and the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake." It is precisely that power that the Secretary exercised here.
 
 
 38
 The American Trucking Court noted the similarity of the power of administrative officers in this regard and the power given to courts under F.R.C.P. 60(a) to correct clerical mistakes. Id. That rule allows courts to correct such mistakes of their own accord until an appeal is pending, but only with leave of the appellate court thereafter. The same is true of administrative agencies. See Zenith Electronics Corp. v. United States, 884 F.2d 556, 561 (Fed.Cir.1989) (once the appellate court's jurisdiction has been invoked, the agency may correct clerical errors only with the court's prior authorization); Pan American Petroleum Corp. v. Federal Power Commission, 322 F.2d 999, 1004 (D.C.Cir.1963) (same). The Secretary satisfied this requirement. After CEMS had appealed the Secretary's 1988 decision to this court, the Department filed a motion to remand the case to the Secretary to allow her to correct an "inadvertent omission" and add the Consortium as a party. Motion to Remand; Respondent's Memorandum in Support of Motion to Remand at 6. We granted the motion. Order (Jan. 20, 1989).
 
 
 39
 The Consortium challenges the Secretary's amendment order on several grounds. None has merit. The Consortium contends that the Secretary's decision was arbitrary and capricious because the Secretary articulated no basis for her decision other than the assertion that the prior omission of the Consortium was inadvertent. Under American Trucking, this is enough.
 
 
 40
 There is, moreover, ample evidence to support the Secretary's determination that the omission was inadvertent. First, as the Secretary explained, it is "well established" that a prime sponsor is responsible for the CETA violations of its contractors and subgrantees. See Secretary's Order (March 6, 1989) at 3. See also San Diego RETC v. Dept. of Labor, 713 F.2d 1441, 1444 (9th Cir.1983); 29 U.S.C. Sec. 816(k) (Supp. V 1981) ("Nothing in this section shall be deemed to reduce the responsibility and full liability of the prime sponsors and other recipients which receive funds directly from the Secretary."); 29 CFR 98.27(d) (1976) (grantee required to oversee operations of subgrantee and assure its compliance with CETA); 20 CFR 676.37(a) (1979) (same). This state of the law is a strong indication that the failure to include the Consortium in the 1988 decision was unintentional.
 
 
 41
 Equally telling is the administrative record. The Consortium was a party to the action before both the grant officer and ALJ. The Consortium's attorney was served with the relevant papers at every stage of the proceedings; he received notice of the grant officer's appeal to the Secretary, and a copy of her final decision and order. Moreover, there is no statement in the record by anyone in the Department of Labor indicating that the Department intended to drop the Consortium from the action.
 
 
 42
 The Consortium nevertheless suggests that the Department may actually have made a substantive decision to hold the Consortium harmless. The Consortium contends that it was therefore entitled to an evidentiary hearing on the question before the Secretary amended her decision. While we doubt that the Consortium has made even a prima facie showing sufficient to warrant an evidentiary hearing, its claim is too late. In response to an order from the Secretary, the Consortium filed a Memorandum to Show Cause Why the Secretary's Final Decision and Order Should Not be Amended. The Consortium made many of the same arguments it makes here, but it did not ask for an evidentiary hearing. The Consortium has waived its right to do so now.
 
 
 43
 The Consortium makes a novel argument based on Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). In that case, the Court held that failure to name a party in a notice of appeal, as required by F.R.A.P. 3(c), bars the appellate court from exercising jurisdiction over that party, even if the failure was due to a clerical error. By analogy, the Consortium argues that the previous panel of this court did not have jurisdiction to remand to the Secretary to add the Consortium because the Consortium was not named in any of the papers filed with the Ninth Circuit. The difficulty with this argument is that Torres was not announcing a general rule of appellate jurisdiction; it was interpreting a specific rule of procedure. That rule places certain requirements on parties bringing an appeal. In this case, it was not the appellant who erred, but the decision maker below. F.R.C.P. 60(a) specifically contemplates that an appellate court may remand to a lower court to correct clerical errors. The Supreme Court has stressed the similarity between 60(a) and the American Trucking rule. American Trucking, 358 U.S. at 145, 79 S.Ct. at 177. Accordingly, Torres does not preclude the remand here.
 
 
 44
 Finally, the Consortium makes vague allegations about denial of procedural due process. Without pointing to anything in particular, the Consortium challenges the "fundamental fairness" of the proceedings leading to their addition to the Secretary's decision. See Opening Brief of Petitioner Seattle-King County Employment and Training Consortium at 22. The Consortium has had due process. As noted, the Consortium was a party before the grant officer and the ALJ, and had an opportunity to be heard in both forums. The Consortium's attorney was served with all relevant papers from all proceedings including the Secretary's order asserting jurisdiction and the Secretary's final decision and order. The Consortium had been a party to the action at all stages preceding the Secretary's final decision, and was fully apprised of all proceedings. On remand the Consortium had an opportunity to argue to the Secretary that it should not be added as a liable party. Under these circumstances, there is no unfairness to the Consortium in the Secretary's amendment order.
 
 Conclusion
 
 45
 The Secretary's determination that CEMS violated the CETA nepotism regulation is affirmed, as is her decision to hold the Consortium liable along with CEMS. The case is remanded to the Secretary to consider whether special circumstances exist that may excuse repayment by either CEMS or the Consortium.
 
 
 
 [1]
 CETA's replacement statute, the Job Training Partnership Act, 29 U.S.C. Secs. 1501-1781 (1982), provides that CETA administrative or judicial proceedings commenced prior to September 30, 1984, are not affected by repeal of CETA. 29 U.S.C. Sec. 1591(e)
 
 
 [2]
 Pierce County concerned a jurisdictional issue not relevant to this appeal
 
 
 [3]
 At oral argument, the Department raised for the first time the possibility that not all of Ms. Elizondo's employment was in a public service employment program, and therefore 106(d)(2) may not be the only applicable statutory section. The Department has never made this argument anywhere before, including in its brief in this appeal. CEMS' attorney, characteristic of his fine presentation in oral argument, offered compelling answers to the Department's last-minute assertion. He need not have done so. Because the Department failed to raise this argument in a timely fashion, we treat 106(d)(2) as the only applicable section for purposes of this appeal
 
 
 [4]
 In Quechan, we remanded to the Secretary to consider "the equities" consistent with his authority to waive repayment under CETA Sec. 106(d)(2). 723 F.2d at 736. We did not consider the effect of 20 CFR Sec. 676.88(c)
 
 
 [5]
 Yes, we are indeed holding that the Department has waived its right to argue that CEMS waived its right to ask for a waiver of repayment